# Watmough's Estate.

*Wills—Testamentary incapacity—Undue influence—Meretricious relations—Devisavit vel non—Insufficient evidence.*

1. Where a will is attacked on the ground of lack of testamentary capacity, the inquiry must relate to that period of time when the will was executed, published and declared.

2. The fact that testator sustained meretricious relations with the chief beneficiary in his will does not raise a presumption that

the will was made under a constraining influence exerted by the paramour. Such influence must be proven as any other independent fact, by adducing such additional evidence as would not warrant any other reasonable inference than that the influence of the relation produced the will by actual or moral constraint to a degree that the testator was unable to resist.

3. An issue devisavit vel non, asked for on the ground of testamentary incapacity, was properly refused where the only evidence relied upon to establish incapacity was that of a physician who had attended deceased for a period of eight years prior to his death and who testified that he observed no mental decline until on an occasion two and one-half months before the execution of the will, when deceased was in his seventy-seventh year, deceased declared that he was annoyed by red devils with forked tails who had danced upon him during the night, and such physician further stated that there were days in the month preceding the execution of the will when deceased was entirely free from delusion and clear in mind, when he knew his relatives and had an intelligent understanding of the value of his estate; and two reputable attorneys, witnesses to the execution of the will, testified that testator was in full possession of his faculties and had himself dictated the will and was fully informed with respect to all that it contained.

4. In such case it appeared that testator was a collector of curios and bric-a-brac and was an intimate friend of a dealer in such objects and the wife of such dealer; that he frequently visited their store during the lifetime of testator's wife and thereafter; that during his wife's lifetime he had given them large legacies in a previous will. After his wife's death, testator made the will in controversy in which he bequeathed $100,000 to his housekeeper "in appreciation of her kindness to my beloved wife," and gave the residue of his estate to the art dealer and his wife. The will was executed in the presence of two lawyers, no other persons being present. For some time prior to the execution of the will, testator's social intercourse was limited to the family of the art dealer and the only person from whom he received any personal attention was his housekeeper. Testator had relatives but was indifferent to them. Contestants alleged no physical coercion on testator, but produced some evidence of criminal relations between testator and the wife of the art dealer, but there was no evidence that such relation produced a moral constraint over testator in the making of his will. *Held,* there was no sufficient evidence of the undue influence and an issue devisavit vel non was properly refused.

Argued Jan. 15, 1917. Appeal, No. 173, Jan. T., 1916, by William Watmough Grier and James H. Watmough,

from decree of O. C. Philadelphia Co., Jan. T., 1914, No. 430, affirming decree of the Register of Wills admitting to probate a paper purporting to be the last will of John G. Watmough, deceased, in Estate of John G. Watmough, deceased. Before BROWN, C. J., MESTREZAT, POTTER, STEWART and FRAZER, JJ. Affirmed.

Petition for issue devisavit vel non.

Appeal from decree of Register of Wills admitting to probate the will of John G. Watmough, deceased. Before LAMORELLE, J.

The opinion of the Supreme Court states the facts.

The court refused the petition and dismissed the appeal. William Watmough Grier and James H. Watmough appealed.

*Error assigned* was the decree of the court.

*William Clarke Mason,* with him *Howard S. Baker* and *Franklin S. Edmonds,* for appellants.—There was sufficient evidence of the mental incapacity of Mr. Watmough to execute a will to warrant the submission of the case to a jury: Waller's Est., 20 Pa. D. R. 181; Dean v. Negley, 41 Pa. 312.

The record shows the undue influence exercised by Matilda Keller and Ferdinand Keller, Sr., upon the testator. It further shows a meretricious relationship existing between Mr. Watmough and Matilda Keller, thereby raising a presumption that she exercised undue influence upon him, which has not been discharged by the testimony of proponents: Dean v. Negley, 41 Pa. 312; Dushane's App., 4 W. N. C. 78; Colgate's Est., 5 W. N. C. 170; Reichenback v. Ruddach, 127 Pa. 564; Stewart's Est., 7 Pa. C. C. 318; Heilbrun's Est., 27 W. N. C. 375; Snyder v. Erwin, 229 Pa. 644; Steadman v. Steadman. 10 Sadler 539; Phillips' Est., 244 Pa. 35.

*Maurice Bower Saul,* with him *Buckman & Buckman,*

for appellees.—The testimony clearly shows that testator possessed testamentary capacity: Wilson v. Mitchell, 101 Pa. 495.

He had a full and intelligent knowledge of the act he was engaged in, a full knowledge of the property he possessed and an intelligent perception and understanding of the disposition he desired to make of it: Shreiner v. Shreiner, 178 Pa. 57; Starrett v. Douglass, 2 Yeates 46; Central Guarantee Trust & Safe Deposit Company v. White, 206 Pa. 611; Mulholland's Est., 217 Pa. 67; Morgan's Est., 219 Pa. 355; Logan's Est., 195 Pa. 282; Cauffman v. Long, 82 Pa. 72; Chidester's Est., 227 Pa. 560; Draper's Est., 215 Pa. 314; Hersperger's Est., 245 Pa. 569.

The evidence did not show that any undue influence had been exercised over testator: Cressman's Est., 246 Pa. 291; Canfield v. Barnes, 234 Pa. 528; Allshouse v. Kelly, 219 Pa. 652; Lewis' Est., 210 Pa. 599; Rudy v. Ulrich, 69 Pa. 177; Main v. Ryder, 84 Pa. 217; Johnson's Est., 159 Pa. 630; Chidester's Est., 227 Pa. 560; Heilbrun's Est., 20 Philadelphia 103; Lazarus' Will, 22 Pa. D. R. 32; Wainwright's App., 89 Pa. 220; Wiles' Est., 247 Pa. 340; Ewart's Est., 246 Pa. 579; Tyson's Est., 223 Pa. 596; McNitt's Est., 229 Pa. 71; Smith's Est., 250 Pa. 67; Herr's Est., 251 Pa. 223; Ferner v. Byers, 219 Pa. 160; Richmond's Est., 206 Pa. 219; Lenhart's Est., 199 Pa. 618; Trost v. Dingler, 118 Pa. 259; Walton's Est., 194 Pa. 528; Eble v. Fidelity Title & Trust Co. Exr. & Trustee et al., 238 Pa. 585; Englert v. Englert, 198 Pa. 326; Caughey v. Bridenbaugh, 208 Pa. 414; Masterson v. Berndt, 207 Pa. 284; Miller v. Oestrich, 157 Pa. 264.

OPINION BY MR. JUSTICE STEWART, May 7, 1917:

The appeal is from the decree of the Orphans' Court of Philadelphia County affirming the action of the register of wills in admitting to probate a paper purporting to be the last will of John G. Watmough, deceased, and in

refusing to award an issue devisavit vel non with respect to the same.    The paper is assailed on two grounds, want of testamentary capacity and undue influence.    With this appeal comes an appendix of nearly 1,600 pages of testimony.    If our review of the case should seem disproportioned to this volume of testimony, we would not have it supposed that because of this fact any of the testimony has been overlooked.    Much of it sheds but little light on the real controversy, and that which relates to those features of the case which under our rules of law are dominating can be presented and discussed within reasonable limits.    For illustration; in considering the first ground of attack, namely, want of testamentary capacity, the inquiry must relate to that period of time when the will was executed, published and declared. This is true especially in this case for the reason that there is nowhere even a suggestion that the person who executed the paper as his last will, in his seventy-seventh year at the time, had ever in his long life been lacking in mental vigor, if we except the brief period of fourteen days when, forty-five years before, he was restrained of his freedom because of excessive drink.    When considering the question of testamentary capacity, we may therefore eliminate from consideration as much of the testimony as relates to his temperament, personal habits and disposition, prior to the March preceding the execution of the will, when, for the first time, his personal and family physician, called on behalf of contestants, testifies that he discovered symptoms of mental decline.    It is upon the testimony of this witness, Dr. Roussel, the contestants place their main, if not entire, reliance, to sustain their allegation of want of testamentary capacity. Aside from this witness's testimony, there is absolutely nothing in the evidence to raise even a suspicion of mental unsoundness in the testator.    As we read his testimony, it admits of no other deduction than that, with exceptional opportunities for knowing and judging his mental state, extending over eight years next prior to

the death of the testator, he never observed anything in his conversation or conduct that led him to suspect mental decline in any degree until the 17th of March next preceding the 6th of June, when the will in question was executed. During all these years he was the medical attendant upon Mr. Watmough, who was a sufferer from hardening of the arteries, a mild cardiac degeneration and sclerotic kidneys, the latter of which, while at first not strongly evidenced, became toward the latter part of his life more pronounced. In January preceding his death, an attack of acute inflammation of the gall bladder developed. The witness having thus defined the physical ailments for which he was treating his patient, his attention was then directed to the attendance he gave him during the months of October, November and December, 1912. During these months he visited the patient at his home about every other day, increasing his visits to three and four times a day as his illness progressed. These visits he testified were made generally in the evening, and they averaged in length from an hour to an hour and a half, not that so much time was employed in administering professional relief or in the study of the patient's condition, but because the witness enjoyed conversing with the patient, who, as he admits, was a man of superior attainments, of wide experience, extensive travel and an intelligent and capable disputant. In these conversations they discussed current events, public men and policies, and whatever there was of general interest. We refer to these facts to confirm what we have said as to this witness's opportunities to know the mental condition of Mr. Watmough, and emphasize the further fact, that during this period of time down to March 17, 1913, the witness calls to mind not a single irrational word or deed on the part of the patient, nothing in his speech or behavior that led him to suspect that he was not mentally sound. Indeed, he admits that he had no such suspicion until an occurrence on the 17th of March, when during an evening visit, after his patient had had a sleepless

night before, because of the intense pain he had endured, the patient said to the doctor, "I am all right now, I am well." To this the doctor replied, "Oh, the pains are much better, are they?" "Well, yes," the patient replied, "they are better, I still have them, but the three red devils told me this morning, or during the night, that they were about to leave me." To this witness replied, "You are speaking figuratively of the pains." "Nonsense," said the patient, "you do not understand what I tell you." Asked by the witness what he meant, he replied, "Simply that they stood on my belly and on the bed and said they were going to leave me, and told me I was going to improve." The witness testified that this was the first thing that attracted his intention to a change in the mental condition of the patient; and this he defined as a visional hallucination, associating it with what he defined as an auditory hallucination, referring to a statement made by the patient that he had heard a call during the night which had caused him to go out to the yard in the middle of the night. When further interrogated as to these hallucinations, the witness replied, "A call which excited his attention and caused him to go to the yard in the middle of the night. Now, this may or may not have been. There might have been, for example, a call from the yard. That may or may not have been an evidence of auditory delusion. The absolute strong points are the questions of these visual evidences of red devils, even with forked tails detailed that they told him certain things, the fact that he had seen them." In the same connection he testified that he could recall nothing that the patient ever told him that he had heard from the red devils other than what related to his personal health. Solely because of this visual hallucination, as the witness denominated it, with respect to seeing red devils, and its occasional recurrence, and because he had reached the conclusion based on this fact alone that his patient was a victim of senile dementia, and no opportunity had been afforded him at the particular hour

of the day when the will was executed to examine him to see whether at that particular hour he was free from the delusion with respect to the red devils, it remained with him a disputable question whether the testator had at that time testamentary capacity. He admitted time and again that there were days during the month of June, 1913, when he was entirely free from the delusion and entirely clear in his mind, when he knew his relatives, had an intelligent understanding of the value of his estate, knew how much income he derived therefrom, and knew as well the persons he intended to make the objects of his bounty. To this extent the witness went, but no further; and yet he visited his patient the evening of the day the will was executed, and learned from him not only that he had made his will that day, but facts relative to the disposition he had made of his property. If upon being told that the patient had that day executed a last will, and that by the will he had given to the maid, who had virtually been his housekeeper, the munificent gift of $100,000.00, any question arose in the witness's mind as to the competency of the patient to make a will, it is at least surprising that he should have overlooked such fact in his lengthy examination. An undisputed fact in the case is that two and one-half months after the execution of the will, during which time, according to the witness, the patient was steadily declining in vigor, without hesitation on his part, or any question as to the patient's sanity and the ability to dispose intelligently of his property, so far as we are permitted to know, the witness accepted from his patient a free gift of $2,000.00 with which to buy for himself an automobile. Against this uncertain and inconclusive testimony,—and we include the medical experts' testimony as well, to which we have made no special reference,—there is the testimony of the two witnesses to the execution of the will, one of whom had drafted it, and both of whom were entirely reputable gentlemen, had long known Mr. Watmough,—one of them having sustained professional rela-

tions with him,—who say that when the will was executed the testator was in possession of his faculties, that he had himself dictated the provisions in the will, had been fully informed with respect to all it contained, and that the will had been executed with no one present excepting the testator and themselves, supplemented by the testimony of a great number of witnesses, among them gentlemen of high professional standing, with large experience in dealing with questions of this character, and who, some of them at least, notably the late John G. Johnson, Esq., who speaking from observation and conversation with the testator within a very few days of the date of the will, with one voice attest the testator's mental soundness. Granting the delusion testified to by Dr. Roussel, it is manifest that it was not such a delusion as was incompatible with the retention of the general powers and faculties of the mind; nor is there the slightest indication that it exerted any influence whatever in the disposition made by the testator of his estate. The evidence, as we read it, not only affords no ground to support a finding of testamentary incapacity, but it abundantly sustains a finding to the contrary.

Turning now to the second ground of assault, a somewhat fuller statement of facts is here required to comprehend the significance of the evidence produced by one side and the other. The testator, at the time of the execution of the will, was in his seventy-seventh year. He was then childless and a widower; his wife, between whom and himself there had always been the closest confidence and endearment, had died May 27, 1911. He himself died October 10, 1913, leaving as his next of kin a half brother, James H. Watmough, the children of a deceased half brother, the children of a deceased half sister, and William W. Grier, son of a deceased sister, who is an appellant here. The testator was a man of large estate, exceeding a half million dollars in value, which he had always managed himself, and so far as appears, with intelligent judgment. He had resided for

many years at 2114 Walnut street, Philadelphia, and continued his residence there after his wife's death. Following the death of his wife he retained in his service his wife's maid, Zalie Faget, whom he installed as his general housekeeper, to whom he gave exclusive charge of his household affairs, employing at the same time other domestic employees and servants. He lived in a manner corresponding to his estate; he was a man of education and culture and of refined tastes; he had few intimates and still fewer confidential friends; he had but little intercourse with his kindred, and during the later years of his life, none; he frequently expressed indifference toward them, in return for what he regarded their indifference towards him; he had withdrawn from active business years before and was living in retirement; he found his enjoyment in wide travel and in indulging his taste in acquiring a large collection of curios and such bric-a-brac as appealed to him. In the latter he had invested a large sum of money and his collection of them was valuable. It was this fondness for rare articles of virtue that brought him into relation with one Ferdinand Keller, who was a dealer in such articles, at first in a small way. This was as early as 1881, when Keller's store was on Ridge avenue. There the testator occasionally visited him until in 1883, upon testator's advice, Keller moved his place of business, as well as his residence, to 216 South Ninth street. This latter property had been purchased by the testator and was by him, in 1888, conveyed—his wife joining in the deed—to Keller's wife, for a nominal consideration. Meanwhile the acquaintance between Keller and the testator, begun in 1881, ripened into an intimacy which developed into a confirmed and avowed friendship and mutual trustfulness, which continued unabated during all the remaining years of testator's life. It included as well the individual members of Keller's family, which consisted of his wife and three children. During all these years, except during such periods as the testator was absent

from the city, he was almost a daily visitor to Keller's place of business, where he was accustomed to spend several hours on each occasion, occupying for the most part a room back of the store which was used by Keller as a repair room. In this room he met frequently Mrs. Keller, who assisted her husband in his business, and their children, and would occasionally there join with them at lunch. Certain it is that this association between the testator and the Keller family, and his fondness for each member of the family, was well known to the testator's wife, for during her lifetime she frequently accompanied her husband to Keller's store, sometimes with a view to make purchases, at times for no other purpose than to meet and talk with the different members of the family. That she held them in high esteem, particularly Mrs. Keller, is evidenced by the consideration she showed the latter by visiting her, inviting her to her own home and the letters written to her in which she always addresses her in most familiar and affectionate terms, some inviting her to come to her home to tea and to bring with her the "dear children," and Keller, and others expressing her appreciation of kindness shown her by Mrs. Keller. These letters fully attest her affectionate regard for the Kellers as a family. Letters from testator to Keller, covering the same period, 1886 to 1911, some from Europe, others from distant parts of this country, and others from his home, some on business, others of purely friendly and social character, all abound in expressions of deepest concern, not only for Keller, but for Mrs. Keller and the individual members of his family, concluding with "God bless and prosper you all and reunite us again," "With much love to all," "Love to dear Mrs. Keller, yourself, dear Tillie and Janet, your devoted friend," "Ever your devoted friend," and like affectionate expressions. Testator bought a great part of his collection of curios which he valued so highly, from or through Keller. That the latter derived much advantage through his patronage,

not only in trade but through his generosity as well, cannot be doubted, but whatever may have been Keller's or Mrs. Keller's motive in extending to the testator the many acts of kindness shown him, it is too manifest to admit of question that his feeling for the Kellers was that of sincere affection. By will made in March, 1907, after making a few pecuniary bequests, he left his entire remaining estate to his wife for life, with remainder to the Kellers. In April, 1911, he executed another will, prepared by J. H. Buckman, Esq., whereby he gave all to his wife for life, except certain bequests, and what he called his "collection," to Keller, telling Mr. Buckman at the time that Keller was his dearest friend—the best he ever had, the only friend who had stuck to him through thick and thin. In a later will of December, 1912, eight months after the death of his wife, drawn by the late John G. Johnson, Esq., he made the following bequests: One of $10,000 to William W. Grier, one of the contestants and next of kin, which, as there stated, was fixed in that amount because the legatee was possessed of an independent fortune of his own and seldom visited or communicated with the testator; one of $20,000 to Zalie Faget; another aggregating $50,000 to the three children of Ferdinand and Matilda Keller; another to Ferdinand Keller, whom he describes as his good friend, of $15,000, with a like sum to Mrs. Keller, the wife; another to the wife of testator's half brother, James H. Watmough, of $50,000. Following some minor bequests and a specific devise, he gave the entire balance of his estate to Keller and his wife, or the survivor of them. By codicil to this will dated January 5, 1912, without changing in other respects the terms of this earlier will of December 12th in any other regard, he substituted as executors of the will John G. Johnson, Esq., and Ferdinand Keller. We refer to these wills as showing the mental attitude of the testator towards the Kellers, both during the lifetime of his wife and following upon her death, as well his attitude toward his kin-

dred.   They show unmistakably a set purpose on his part of long standing to make Keller and his family his principal beneficiaries.   This was the condition of affairs upon the death of Mrs. Watmough and immediately following.   The testator's manner of life was much the same after as before.   As age was creeping on, his physical infirmities increased and he became the victim of disease, often painful in the extreme and increasing in virulence, until the summer of 1913, when the will, the subject of this controversy, was executed.   Four months thereafter he died.   During this period of invalidism he required much personal attention.   The only person from whom he seems to have received any was Zalie Faget, she who had been his wife's maid and whom he retained in his employ as general housekeeper, and the Kellers, whom he visited at their store with the same frequency as before, so long as he was able.   His social intercourse was apparently limited to the Keller family; his intimacy with them and his fondness for them may seem strange when the difference in station and rank is considered, but the evidence puts it beyond question that somehow or other they had become the chief objects of his beneficient concern.

This brings us to the will which is the subject of the present controversy, executed June 6, 1913.   This will was drafted at the direction of the testator by Charles J. McDermott, Esq., at the office of John G. Johnson, Esq., and executed at testator's own home, in the presence of Mr. McDermott and Maurice Bower Saul, Esq., both of whom testify that no one but themselves and the testator were present at the time.   The first item in this will gives to Zalie Faget "now in my employ, and who was maid to my dear wife, Caroline Drexel Watmough, in her lifetime," the sum of $100,000.00, "in appreciation of her kindness to my beloved wife."   Separate bequests, one only amounting to as much as $1,000.00, were made to his servants, conditioned on their being in his employ at the time of his death; then follows this direction, "All

the rest, residue and remainder of my estate I give, devise
and bequeath to my friends, Ferdinand Keller, Sr., and
Matilda Keller, his wife, in equal parts, or in case only
one of them shall survive me, then to the survivor of
them." Of this will he appointed his "two friends"—he so
speaks of them—John G. Johnson, Esq., and Ferdinand
Keller, Sr., executors. Upon the facts and circum-
stances before stated, and upon testimony yet to be re-
ferred to, the appellants rest their contention that the
will was a product of an undue influence operating upon
the mind of the testator at the time of its execution,
which substituted another's will for his own. It is not
pretended that the testator was subjected to physical
coercion of any kind, the sole contention being that be-
cause of criminal relations he is alleged to have sus-
tained towards Mrs. Keller, the wife of Ferdinand, he
was subjected to a moral constraint which so entered
into the making of the will as to make it the expression
of another's desires rather than his own; in other words,
that he was no longer a free agent. At this point, the
young woman, Miss Faget, to whom is given a legacy of
$100,000.00, may drop out of the case. It is only fair
to her to say here that there is not a particle of evidence
in the case that would support a finding that either alone
or in combination with others she contributed in any
way to the procurement of the will, not even to the ex-
tent of solicitation that she should be a beneficiary there-
under. The argument in support of the general charge
assumes that the will is inofficious in that it denies to
those upon whom the law would cast the inheritance in
the absence of a will all participation in the estate, and
then proceeds to derive from the evidence, in explana-
tion, a meretricious relation with one of the chief bene-
ficiaries under the will, from the influence of which tes-
tator could not and did not escape, but which was opera-
tive in his mind and controlling when the will was ex-
ecuted. Unquestionably within the literal meaning of
the term the will was inofficious. The weight to be given

this circumstance depends upon the degree of kinship in which the party disinherited stands toward the testator. A will disinheriting a child, or children dependent, and substituting in their stead, as beneficiary, one with whom the testator sustained illicit relations, would be not only inofficious but unnatural, and a strong presumption would arise in such case that the testator, even though of testamentary capacity, was nevertheless in thraldom of some kind inconsistent with free agency. The more remote the degree of kinship, the feebler becomes the presumption until it reaches the point where it becomes negligible. The nearest of kin in this case was a nephew, the son of a deceased sister, and here the contestant. To this nephew by a former will was given a legacy of $10,-000. It was the belief of the testator that he was a person of independent fortune. This legacy was omitted from the last will, the testator assigning as a reason for the omission, that the nephew seldom visited him or had any communication with him. Whatever the presumption in such case, it was more than met and overcome by the evidence showing the reasons testator gave for disinheriting the nephew, this evidence being unchallenged and no attempt having been made to show that the reasons on which testator relied rested on any mistake of fact. Certainly the fact that the will was inofficious can be of minor significance in such a case. It in no wise conflicts with contestant's theory that a meretricious relation with Mrs. Keller produced the will, nevertheless it adds little, if anything, in support of such contention. We do not stop to inquire into the disputed question of fact, for the reason that it has not the significance that has been attached to it throughout this case. Granting the improper relation charged, such circumstance in itself would not make the will illegal. A testator, so long as he is a free agent, has a right to give his property to whom he pleases; nor does the fact that with the chief beneficiary in the will he sustained improper relations, raise any presumption that the will was made

under a constraining influence exerted by the paramour. Such influence, if alleged, must be proven as any other independent fact, by adducing such additional evidence as would warrant no other reasonable inference than that the influence of the relation not only produced the will, by actual or moral constraint to a degree that the testator was unable to resist. We find no such evidence in the case; nothing that even indicates anxiety or concern on the part of the Kellers as to the will, importunity by either that the testator make a will, much less that he make them beneficiaries thereunder, or that they or either of them were taken into testator's confidence with respect to the will about which we are inquiring. No combination or conspiracy is shown to delude, deceive, or by artifice of any kind to accomplish the execution of the will. There is nothing in the evidence to show that testator was not at perfect freedom to express his own desires independent of the wishes of any other. The impression left upon an impartial mind, after reading the evidence in the case, must be that in making the will he was master of himself, and that in disposing of his estate, acting with entire freedom of choice, he gave it to beneficiaries who, though not related by kinship, yet stood higher in his affectionate regard than those who were so related, in consequence of long continued association and intimacy, which ripened, as we have said, into closest friendship, with mutual trust and confidence. We do not deem it necessary to enter into any discussion to vindicate the legal rules and principles which we have applied in considering the case. Our reports abound in cases where they have been explained and applied with judicial sanction and approval, to an extent that further effort to that end would be unprofitable, especially in view of the very careful and exhaustive review of the authorities bearing on the subject by our brother, VON MOSCHZISKER, in the recent case of Phillips' Est., 244 Pa. 35. We are of opinion, upon a careful examination of all the evidence in the present case, that a verdict against

this will could not properly be sustained. The decree of the court refusing an issue is accordingly affirmed, at the costs of the appellants.