## Linton's Appeal.

1. The fact that a testatrix, a married woman, at and immediately before the signing of her will (which had been previously written), was in a state of intense nervous excitement and apprehension of death, caused by her being about to submit to a dangerous surgical operation, and aggravated by a quarrel with a member of her family, is not sufficient to warrant the court in awarding an issue devisavit vel non, on the allegations of testamentary incapacity, and that the testatrix was unduly influenced by prejudice and passion; especially where, as in this case, the testatrix recovered from the surgical operation and afterwards made no change in her will.

2. The fact that by said will the testatrix's confidential legal adviser, who wrote it, was made one of the executors thereof (but not a devisee or legatee thereunder), is not sufficient, under the above stated circumstances, and upon his propounding the will for probate four years after the testatrix's death, to cast upon him the burden of proving testamentary capacity and the absence of undue influence.

3. Boyd *v.* Boyd, 16 P. F. Smith 283; Cuthbertson's Appeal, 1 Out. 163; Wilson's Appeal, 3 Out. 545, distinguished.

4. The seventh section of the Act of April 11th 1848, requiring that a will by a married woman shall " be executed in the presence of two witnesses, neither of whom shall be her husband," must be read in connection with the general Act of 1833. The word " executed," in the Act of 1848, refers to the formality of making a will required by the Act of 1833, with the additional requisite that it shall be done in the presence of the two witnesses.

5. Hence, all that is necessary to the execution of a valid married woman's will, is that two witnesses, neither of whom shall be her husband, shall be present when the testamentary paper is signed by her, and either see her sign it, or receive the acknowledgment of the genuineness of her signature thereto.

6. It is not necessary that the subscribing witnesses should be able to testify affirmatively that the testatrix knew that the instrument which she signed was her will, or that she formally published or declared it to be her will in any other way than by signing it, and requesting them to attest her signature.

October 9th 1883. Before Gordon, Trunkey, Sterrett, Green and Clark, JJ. Mercur, C. J., and Paxson, J., absent.

Appeal from the Orphans' Court of *Armstrong county:* Of October and November Term 1883, No. 126.

Appeal by A. F. Linton and P. R. E. Elwina Linton, his wife, from a decree of said court dismissing their appeal from the decree of the register, admitting to probate the will of Jane D. Finlay, deceased, and refusing their petition for an issue devisavit vel non.

From the testimony taken by the register, and submitted to the court, the following facts appeared: Mrs. Jane D. Fin-

lay died December 30th 1876, leaving an estate worth over $50,000, and leaving to survive her, her husband, John B. Finlay, an only child, P. R. E. Elwina, then about fourteen years of age (now the wife of A. F. Linton), and her father, James D. Brown. Letters of administration were granted upon her estate, and subsequently in January 1881, in pursuance of a citation issued by the register, the following testamentary paper in question was produced by John Gilpin, and offered for probate:

I, Jane B. Finlay, of Kittanning borough, in Armstrong county, state of Pennsylvania, do make and publish this my last will and testament (hereby revoking any and all prior wills by me at any time heretofore made) in manner following, to wit: As to all and singular the property, whether real, mixed, or personal, or choses in action of whatsoever kind and wherever situated, that I may own or be entitled at the time of my death, I do give, devise, and bequeath the same unto Grier C. Orr, and his heirs, to have and to hold the same for the uses and trusts following, to wit: In trust to receive and collect the rents, issues, profits and proceeds of said property, and from time to time, until my daughter Phœbe R. E. Elwina Finlay, shall attain the age of twenty-one years, to add such rents, issues, profits and proceeds to the principal sum or property; and after my said daughter shall have attained the age of twenty-one years, then in trust to receive and collect the rents, issues, profits and proceeds of said property and its accumulations, and to pay over to my said daughter the said rents, issues, profits and proceeds, in semi-annual installments, for her sole and separate use during her natural life, and after her death, then to hold the said property in trust for her children, who may survive her, or their issue; and in case my said daughter shall die without leaving lawful issue living at the time of her death, then in trust to invest said property and accumulations in such memorial as said trustee or his successor shall determine will best perpetuate the name and memory of my said daughter.

Item. I do hereby nominate, constitute and appoint my friends, Grier C. Orr, Esq., and John Gilpin, of the borough aforesaid, the executors of this my last will and testament.

Lastly, that I do recommend that the trustee hereinbefore named shall, when he sees proper, and deems it for the interest of my said daughter, sell or dispose of any portions of the property herein devised or bequeathed to him, and shall hold the proceeds of such sales in lieu of the portions so sold; and I do hereby authorize and empower the said Grier C. Orr, Esq., to sell and dispose of any and all property that I may own

[Linton's Appeal.]

or be entitled to at the time of my death, to such person or persons, in such manner, and for such prices as he shall deem meet; and I do order and direct that the purchaser or purchasers from said Grier C. Orr, Esq., shall be in no wise liable or bound to see to the proper application of the purchase money which they may pass to said Grier C. Orr, Esq.; and further, upon receipt of the purchase money said Grier C. Orr shall have full power and authority to make, execute, and deliver to the purchasers, deeds and conveyances, in fee simple or otherwise, for any of said property which he may see fit to sell.

In witness whereof, I, Jane B. Finley, have to this my last will and testament, written upon two pages of paper, hereto set my hand and seal, this eleventh day of December, A.D., eighteen hundred and seventy-five.    · JANE B. FINLAY.

Signed, sealed, published and declared by Jane B. Finlay, the testratrix, as and for her last will and testament, in the presence of us, who have at her request signed our names as witnesses thereto, in the presence of said testatrix and of each other.                    JAMES KING.
                                T. H. ALLISON.
                                T. M. ALLISON.


Testimony was offered explanatory of the delay in presenting the will for probate.

It was shown that the execution of the will took place on December 13th 1875, just previous to the performance of a dangerous surgical operation upon the testatrix, viz., the removal of cancer in the breast.

Dr. James King, one of the subscribing witnesses to the will, being dead, his signature was proved.

Dr. T. H. Allison, another of the subscribing witnesses, testified, inter alia, as follows:

Q. Did you see Jane B. Finlay sign it (the will)?

A. Now, listen closely. On the 13th day of December, 1875, in a room of the house in which Mrs. Finlay was living, she pulled out a paper from some place about her person, and said: "Gentlemen, I want you, or I wish you, to see me sign this, or witness this," or some words equivalent to that. I don't remember the words exactly. She went to a chair over at the side of the room, and sat down, and took this paper that she had brought forth, and she took a pen and ink in her hand, and I saw her making motions as though she were writing. Dr. King went forward first; you saw his writing here. . . .

I had been at the house before. When I came in, just before the operation, Mrs. Finlay and her father were quarrelling. It appeared to me that they were jangling something

[Linton's Appeal.]

about a deed connected with a house. I had gone from there into the front room. She followed in, and I suppose others. I don't know who all. About this time she jerked this paper from out of her bosom, and I think said, "I will do it;" said that to her father.

Q. Just at that point what was her appearance as to excitement or calmness?

A. She was very much excited—intensely excited.

Q. Was that before you signed this paper that she made use of that language?

A. Yes, sir.

Q. Now, as near as you can, if you can estimate it, how long before you signed that paper?

A. A very short time—a very few minutes.

Q. Between the time that she made that reply to her father, and the time that you signed the paper, had there been any change in her condition as to excitability?

A. I think not.

Q. No change in her condition?

A. I think not.

Q. How long, Doctor, after you signed that paper did you perform the operation?

A. Just as soon as we got everything ready.

Q. Within an hour?

A. I think so. . . .

Q. What was her physical and mental condition as to excitement?

A. Her physical condition was bad. Her mental condition was very much excited, both before and at the time of the operation.

Q. At the time you were asked to and did sign the paper, Doctor, did any person read any portion of that paper in your presence or hearing?

A. They did not.

Q. Was it named in your presence or hearing as a will?

A. It was not.

Q. Did Mrs. Jane B. Finlay at any time ask you to sign it as her will?

A. She asked us as I have told you; her language was, "Gentlemen, I want you to witness this," or words equivalent to that anyway.

Q. The point in my question is, did she ask you to witness it as a will?

A. That was the full amount of her language.

Q. A word of the will was not read?

A. No, sir; nothing said about a will. . . .

Q. At the time you signed that paper was Mrs. Jane B. Finlay of sound mind, memory, and understanding?

A. What do you mean by the words sound mind?

Q. Well, the legal construction is: that is, that she was of sufficient soundness of mind, memory, and understanding to make a valid will. You understand the meaning of sound mind, memory, and understanding just as well as I do, and a little better. You take your own view on that?

A. To answer that, yes or no, I don't like that. What is it you want of me?

Q. Sound applies to the words mind, memory, and understanding.

A. I don't like that kind of a question, the way that you put it in. I don't like it. I don't pretend to intimate at all that Mrs. Finlay was clear insane. She was very much excited, and her mind had been wrought up by her diseased condition to a very great extent, and the trouble with her father had got her into a still greater state of excitement that day. She had very great fears in regard to the disease; she had very great fears in regard to being placed under an anæsthetic; and she had great fears in regard to the operation, from the fact of her mother having died under the same circumstances; these were her fears. . . . As I said before, I saw Mrs. Finlay sit down and take a pen, and went through the motions, I presume, of writing. Dr. King went forward, and, I presume, I suppose signed this; then, I presume, I went forward and signed, as it is my name here.

Q. Did she specifically acknowledge in your presence, Doctor, either of those signatures?

A. She said nothing about them.

Q. When she had the pen and ink and made this writing, was it on a chair or table?

A. She was writing on her knee. . . .

Q. From the 6th of December, 1875, to the 13 of December, 1875, Mrs. Finlay discussed with you in a reasonable, sensible manner, the proposed operation and the probabilities of it, did she?

A. Well, some of it was sensible and some of it was not extremely sensible.

Q. Did she seem to appreciate the nature of the disease?

A. Yes, she was appreciating it wonderfully well.

Dr. T. M. Allison, the other subscribing witness, testified, inter alia, as follows:

Q. After the communication of the result of your consultation there, what was her condition as to excitement and mental condition.

[Linton's Appeal.]

A. She was very much excited.

Q. State now whether she asked you to sign any paper and just as near as you can what she said about it.

A. She produced a paper of some kind, I don't know what, from about her person somewhere, from the bosom of her dress and asked us all to come. She said, " Gentlemen, I want you to witness my signing this paper," or witness her signature, I believe was the words.

Q. Did she sign in your presence?

A. Well, I suppose she did. She took a pen in her hand. She had the instrument on her knee, on a writing stand or portfolio, or something of that kind; took a pen in her hand and run over it. I suppose she was writing her name; I was not very clear.

Q. You could not see the actual signature?

A. No, sir, I did not see her make the letters to form the name.

Q. You saw her make motions as though she was writing.

A. Yes, sir.

Q. In medical parlance, what would you call her condition at the time? Was it in the nature of hysteria, or was it something else?

A. It would be pretty hard to give it a name. I have spoken of her being in a great state of nervous excitement; wonderfully wrought up; acted somewhat strangely; talked a great deal, and at random sometimes. It would bear as closely on hysteria as anything I could name, part of it.

R. J. Karns testified, under a commission to Socorro, New Mexico, as follows:— .

Fourth. What do you know about Mrs. Finlay, having a form of will written about the time of, and before said surgical operation was performed? Do you know whom they employed to write said form of will and if so state who it was?

A. A few days prior to the said surgical operation having been performed, while she was in a very poor state of health, she directed me to go and ask Mr. John Gilpin, a practicing attorney of Kittanning, to call upon her. I gave him the message, that is, I gave Mr. John Gilpin the message, and he called upon her, and I understood it was for that purpose, of drawing up a form of will for her.

Fifth. What did she say of the form of will that was prepared for her when she received it? What objections, if any, did she make, and what reply did the attorney who wrote the will make to such objections?

A. One or two days after Mr. Gilpin had called upon her as aforesaid, and before the surgical operation had been performed, I took up a paper from Mrs. Finlay's table purporting

[Linton's Appeal.]

to be a will, written in the handwriting of said Mr. Gilpin, but without any signature whatever. Mrs. Finlay told me that was the paper Mr. Gilpin had prepared for her to sign, and added, " I am so far gone I really don't know what is in it. I have left it all to Mr. Gilpin, believing he will act honestly in the matter," or words to that effect, which words she repeated several times in my hearing, and even after said surgical operation was performed, after she began to get better, said that she really did not know what was in said will.

Mrs. Mary Henry tessified in answer to interrogatories under a commission to Port Huron, Michigan, as follows:—

4. As to a paper purporting to be a will written by John Gilpin, Esq., for the said Mrs. Jane B. Finlay, I did know of said paper. Mrs. Finlay said to me when I first saw her after said operation, " Why did you not come sooner and I would have given you something in my will?" I said, " Is it too late now?" She said, " Yes; I have given everything away." Knew of no changes she wanted made.

5. Was with Mrs. Finlay some six or seven months after the operation. All she said about her will was that she had made it at the time or just before the operation was performed. This she told me when I first saw her after the operation, and she never spoke of it again.

R. J. Karns, Mrs. Henry, and Sallie R. Brown testified as to angry disputes and quarrels between Mrs. Finlay and her father prior to and about the date of the alleged execution of the will.

The register revoked the letters of administration, and admitted the will to probate, from which decision A. F. Linton and wife appealed to the Orphans' Court, and also presented a petition for a precept for an issue to the Common Pleas, alleging want of testamentary capacity, undue influence, and that the proofs before the register were not sufficient for probate.

The court, in an opinion by BREDIN, J., refused the petition for an issue and dismissed the appeal; whereupon said A. F. Linton and P. R. E. Elwina, his wife, took this appeal, assigning for error the said action of the court.

*George W. Guthrie* and *J. P. Colter* (*H. Burgwin* with them), for appellants.—The will was drawn by the testatrix's confidential adviser, who, being an executor, takes a benefit thereunder. The evidence shows great mental disturbance on the part of Mrs. Finlay at the time of its alleged execution, and such mental weakness, though far short of testamentary incapacity, is sufficient to cast the burden of proof on the proponent, within the principle of Boyd *v.* Boyd, 16 Smith 283 ;

Frew *v.* Clarke, 30 Smith 170; Cuthbertson's Appeal, 1 Out. 163. Moreover, the will is inofficious, harsh, and unnatural; a large estate is left, not to the only child of the alleged testatrix, but to accumulate, and be expended in a memorial by the trustee. There was uncontradicted evidence that the instrument was not read to, or by Mrs. Finlay, at the time it is alleged to have been signed; and that before and after that time she declared that she did not know its contents; and no will can be valid the contents of which the testator does not know and approve. The proponent did not explain his possession of the instrument. His retaining the will for over four years without presenting it for probate, and his permitting the estate in the mean time to be administered by administrators, are suspicious circumstances not explained: Theobald on Wills p. 20; Cleare *v.* Cleare, 1 Law Rep. P. & D. 655; Harter *v.* Harter, 3 Law Rep. P. & D. 11; In re Oswald, 3 Id. 162; Day *v.* Day, 2 H. W. Green (N. J.) 549; Harris *v.* Vanderveer, 6 C. E. Green 561. The alleged will in this case was not executed according to the requirements of the Act of April 11th 1848, section 7, providing that the wills of married women "shall be executed in the presence of two or more witnesses, neither of whom shall be her husband." The substitution in the Act of 1848 of the word "executed" instead of the word "signed" used in the Wills Act of 1833, indicates that something more than mere signing is required, namely, that the will shall be executed as a will in the presence of "two witnesses," etc. The evidence clearly shows that Mrs. Finlay did not refer to it as a will: Fransen's Will, 2 Casey 202: Camp *v.* Stark, 2 W. N. C. 577; S. C., 32 Sm. 235; Rich *v.* Keyser, 4 Smith 86; Anderson's Est. 4 Norris 207. Under statute 1 Vict. ch. 26, which provides, that the signature to a will shall be "made or acknowledged" in the presence of witnesses, such an execution as here alleged would not be sufficient: Ilott *v.* Genge, 4 Moo. P. C. 265; In re Ashton, 5 Notes of Cases 548; In re Swinford, 1 Law Rep. P. & D. 630; In re Ann Rawlins, 2 Curt. 326; In re Harrison, Id. 863; Hudson *v.* Parker, 1 Rob. Eccl. 14; Blake *v.* Blake, 7 L. R. Prob. Div. 102.

*Jos. Buffington* and *J. H. McCain* (*O. Buffington* with them), for appellees.—The evidence entirely fails to show want of testamentary capacity in Mrs. Finlay, or to rebut the legal presumption that Mrs. Finlay had knowledge of the contents of her will: Stevens *v.* Vancleve, 4 W. C. C. Rep. 265; Provis *v.* Reed, 5 Bing. 435; Comstock *v.* Hadlyme, 8 Com. 263; Hoshauer *v.* Hoshauer, 2 Casey 406; Irvin *v.* Deschamps, 1 W. N. C. 565; Loy *v.* Kennedy, 1 W. & S. 396; Lewis *v.* Lewis, 6 S. & R. 495. The word executed in the Act of

[Linton's Appeal.]

1848 merely refers to the qualifications and formalities required by the Act of 1833, with the restriction that neither of the witnesses shall be the husband of the testatrix, the purpose being protection against the influence of the husband. Carson's Appeal, 9 Smith 493 ; Camp *v.* Stark, 32 Smith 235 ; Dickinson *v.* Dickinson, 11 Smith 407. If the appellant's interpretation be correct, the will of every covert testatrix would be at the mercy of the witnesses' memory. Having proved the signature of Dr. King, and his death, it amounts to the same thing as though he had actually testified to all facts necessary to admit the will to probate : Harden *v.* Hays, 9 Barr 151 ; Egbert *v.* Egbert, 28 Smith 326 ; Werstler *v.* Custer, 10 Wr. 502. The English cases cited by appellant's counsel are not authority in Pennsylvania under our Act : Miller *v.* McNeil, 11 Casey 217 ; see also Smith *v.* Smith, 14 Weekly Rep. 648 ; Hart *v.* Roberts, 12 Moore P. C. 158 ; Beckett *v.* Howe, 18 Weekly Rep. 75 ; Gwillim *v.* Gwillim, 3 Swab. & T. 200.

Mr. Justice STERRETT delivered the opinion of the court, January 7th 1874.

There appears to be nothing in the evidence that would have justified the court below, in sending the question of testamentary incapacity to a jury. Giving to appellants' testimony on that subject, all the weight to which it is reasonably entitled, we think it was insufficient to create even a doubt as to the competency of Mrs. Finlay to make a will. It is true, that on the day the alleged will was signed, she was laboring under great nervous excitement, caused by her misgivings as to the result of the operation, to which she was then about to submit, and intensified by an unpleasant altercation with her father about the same time ; but, notwithstanding all this, the evidence clearly shows she had an intelligent understanding of what transpired in her presence, and especially of the business she wished to transact before the operation was performed. In the language of one of the witnesses, Mrs. Finlay "had great fears in regard to her disease. She had great fears in regard to being placed under an anæsthetic, and she had great fears in regard to the operation, from the fact that her mother had died under similar circumstances. These were her fears." Doubtless, in view of these not unreasonable apprehensions, the subject of making a will had been previously considered in all its bearings ; and, having determined in her own mind how her property should be disposed of, she had caused the testamentary paper to be prepared beforehand, so that when she concluded to submit to the surgical operation, it was ready, as the testimony shows, for her signature and signatures

of the attesting witnesses. The work of reflection had been previously done, and its result was embodied in the paper which is the subject of this contention. The presumption of law is that she was not only compos mentis, and capable of making a will, but that she knew the contents of the paper the execution of which she requested her attending physicians to witness; and, we discover nothing in the testimony that is sufficient to rebut that presumption or warrant a finding to the contrary. The mental condition of Mrs. Finlay, before and at the time the will was signed, is shown by the testimony of the physicians in attendance. One of them, speaking of the consultation with Doctor James King and others, in regard to the surgical operation, says: "Mrs. Finlay and her father also talked very considerably about it, and decided to have it done. Having agreed to that, we went into the front room and then came the signing process." It thus appears that just before signing the paper, which according to the testimony must have been previously prepared, the testatrix participated in the conversation that took place in regard to the proposed operation, exercised her own judgment as to its propriety, and in view of the opinions expressed by her chosen medical advisers, and notwithstanding her own serious apprehensions of a fatal result, consented to have it performed. The learned professional gentlemen, to whose judgment she thus deferred, must have considered her competent to decide for herself, whether she would submit to the treatment they proposed, or not. The circumstances detailed by the witnesses referred to clearly indicate an intelligent exercise of judgment coupled with unusually strong will power. Opposed to this, we have nothing save the fact that she was laboring under great nervous excitement which is fully and satisfactorily accounted for. In view of all the evidence, it is altogether improbable that any jury would be willing to say by their verdict that Mrs. Finlay was not of sound and disposing mind, memory and understanding at the time the will was executed; and if they did happen to so find, their verdict should not be permitted to stand. Under such circumstances it was a wise exercise of judicial discretion to refuse an issue.

In view of the facts, that proponent of the alleged will was the scrivener by whom it was written, that he is one of the executors therein named, that he retained the instrument a long time without presenting it for probate, and other circumstances disclosed by the testimony, it is contended that it was incumbent on him to prove affirmatively that the paper was drawn in accordance with previous instructions of testatrix, or that she was fully aware of its contents and legal effect. There is nothing in the testimony to sustain this proposition, or bring

the case within the principle of Boyd v. Boyd, 16 P. F. Smith 283 ; Cuthbertson's Appeal, 1 Out. 163, and Wilson's Appeal, 3 Id. 545. The proponent of the will is not shown to have had any such interest in establishing its validity as could in any manner shift the burden of proof. He is neither devisee nor legatee. The only interest he can be said to have under the will is the compensation to which he may be entitled for his services as executor. We find nothing in the evidence to take this case out of the ordinary rule. When the due execution of a testamentary paper has been proved by the subscribing witnesses, although they did not hear it read to the testator, certain legal presumptions arise, among which is, that he was acquainted with the contents of the paper, notwithstanding he could neither read nor understand the language in which it was written. In the absence of proof to the contrary, the presumptions that arise from the ordinary course of business must be admitted and given due effect. One of these presumptions is, that a person signing any instrument, and asking others to attest its execution, has taken care to understand its contents. His signing shows he is giving expression to some purpose of his own, and we must presume he knows the writing contains that expression: Hoshauer v. Hoshauer, 2 Casey 404. In this connection it may be observed that the learned judge of the Orphans' Court did not underestimate the value of testimony by which appellant sought to prove that Mrs. Finlay was ignorant of the contents of the will. In summarily dismissing the somewhat remarkable testimony of Robert Karns, as to declarations made to him long after the will was executed, he was quite right in saying that, " if believed, it would be entirely insufficient to cast suspicion even on Mrs. Finlay's knowledge of the contents of the will." After the will was signed, her health was measurably restored and more than a year thereafter she died of a different disease. It is wholly improbable that during that length of time she preserved a testamentary paper the contents of which she did not know at the time it was signed and witnessed ; but, aside from the inherent unreasonableness of such testimony it was insufficient on general principles. The declarations of a party to a deed or will, made to a stranger subsequently to its execution, are a species of hearsay evidence ; and, nothing would be more dangerous than to give it the effect claimed for it in this case. It would in a great measure render useless the precaution of making a will : Stephens v. Vancleve, 4 W. C. C. Rep. 265 ; Hoshauer v. Hoshauer, supra ; Provis v. Reed, 5 Bing. 435. In view of the undisputed facts in the case the testimony referred to was wholly insufficient for the purpose for which it appears to have been introduced.

It is also contended that the requirements of the Act of

[Linton's Appeal.]

April 11th 1848, authorizing married women to dispose of their property by will, have not been complied with, in that the testimony fails to show that the alleged will was either signed or published by the testatrix as contemplated by the Act. The Act referred to being in pari materia with the general Act of 1833, both Acts must be construed together. After declaring who shall be competent to make a will, the latter Act provides that every will shall be in writing, and unless the person making the same be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence, and by his express direction ; and in all cases shall be proved by the oaths or affirmations of two or more competent witnesses. Under this Act, it has been held that subscribing witnesses are not essential, that proof of testator's signature by two witnesses is prima facie evidence of due execution. The Act of 1848 was designed to protect married women in the use and enjoyment of their separate property during life, and guard them from imposition or undue influence in freely disposing of it at their death. Hence, in providing for a testamentary disposition of a married woman's property, the Act requires that her will shall " be executed in the presence of two witnesses, neither of whom shall be her husband." This appears to be the only change effected by the Act in regard to the formality of making a will by a married woman. It was never intended that the witnesses should know the provisions of the will or be able to testify that the testatrix understood its contents, or published it as her will in their presence. The word " executed " evidently refers to the formality of making a will required by the Act of 1833, with the additional requisite that it shall be done in the presence of the two witnesses. The execution of a testamentary writing consists in the act of signing it, in the mode prescribed by the statute, with the intention and for the purpose of rendering it valid and operative as the will of the person so signing it. Hence, all that is necessary to the valid execution of a married woman's will is that the witnesses required by the Act be present when the testamentary paper is signed by her, and either see her sign it, or receive her acknowledgment of the genuineness of her signature thereto. The testimony in this case clearly proves that Mrs. Finlay took from her person the paper in question ; and addressing the subscribing witnesses, said: " I want you to witness my signing this paper," or words to that effect, that " she then took the paper on her knee, on a writing stand or portfolio, and went through some motions as though writing." The three witnesses then went forward and appended their names to the attesting clause, which is in these words, viz: Signed, sealed, published and declared by Jane B. Finlay; the

[Book *v*. Book.]

testatrix, as and for her last will and testament, in the presence of us, who at her request signed our names as witnesses thereto, in the presence of the testatrix, and of each other." It is not questioned that the signatures of the subscribing witnesses, as well as that of the testatrix, are genuine, nor is it doubted that they witnessed the paper at her request. The evidence that Doctor James King, one of the subscribing witnesses, is dead, and that the signature purporting to be his is genuine, is equivalent to positive proof, by one witness, of every fact stated in the attesting clause. The testimony of the other subscribing witnesses warrants the conclusion that Mrs. Finlay signed the paper in their presence, and that they at her request witnessed it. No other rational inference can possibly be drawn from their testimony. It was not necessary that they should be able to testify that testatrix knew the instrument she signed was her will, or that she formally published or declared it to be her will, in any other way than by signing it, and requesting them to attest her signature. As we have already seen, in the absence of evidence to the contrary the presumption is that she was familiar with the contents of the testamentary paper. The requirements of the Act of 1848 are sufficiently met by the evidence. There was no error in dismissing the appeal and refusing the issue.

Decree affirmed and appeal dismissed at costs of appellants.