## Kesler et al., Appellants, *v.* Hugus.

*Wills—Probate—Undue influence—Evidence—No case for jury.*
In a will contest, the case should not be submitted to the jury, where the evidence shows that testator had the benefit of advice of counsel, that his will was executed, at a time when none of the beneficiaries were present, pursuant to an oft-repeated, openly expressed intention to disinherit a son who had so far repudiated his father as to refuse his name; which fixed purpose was deliberately persisted in over a period of sixteen years, as evidenced by the republication of the will on two occasions; and this is particularly so, where the contestant offers nothing but a mass of oddly assorted circumstances and inconclusive statements to establish his claim that undue influence was exerted.

Argued September 27, 1921. Appeals, Nos. 170-178, by plaintiffs, from judgment of C. P. Westmoreland Co., Nov. T., 1918, No. 444, on verdict for defendant, in 'case of Alice J. Kesler et al. v. Samuel O. Hugus. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Issue to determine validity of will. Before COPELAND, J.

In addition to the facts stated in the opinion of the Supreme Court, the following relevant evidence is noted:

Contestant, Samuel O. Hugus, testified that, when he was about seven years old, he met his father, William A. Nicolls, whose will is attacked in these proceedings, and the latter spoke to him, saying, simply, "Well, Samuel"; when he was about ten or twelve years of age, he met his parent again, and the father did not speak to him at all; at various times thereafter they met, his father sometimes speaking and at other times failing to notice him; they had one conversation in 1909, in which contestant said to his father, "I wish you would come to see me; I have two sons and a wife, and would like

to have you come and visit me"; the reply was, "I would not dare to come on account of the Hannas" (his sister's family, the members of which were most benefited by the will); shortly after this, contestant met his father and said "You have never got over to see us yet"; the father answered, "Well, I would not dare come; I am not in a position"; decedent was invited to his son's wedding in 1892, but did not attend; on another occasion they met at the Ligonier Fair, and the father avoided speaking. Hugus further testified: "Q. When were the times as it appeared to you that he recognized you, and when were the times that he did not recognize you? A. The times there was any person around. If he was at a sale or any place like that he would always get away from me. If I would meet him alone he always spoke and talked to me after that one time." On cross-examination Hugus testified that his father had consulted seven of the best attorneys to find out whether he could make a will disinheriting contestant, and had been advised it could be done; that he "appeared to be uneasy when he would meet him in a crowd; but he would talk with him if they met alone"; again, "Q. Then there could not have been good feeling between you and your father if he was unwilling to see you? A. He was always afraid......He showed it. He did not want to come in contact with me when anybody was around. Q. When he met you, for example, in Greensburg, with none of his relatives around, did he show an inclination to address you or speak to you? A. He was afraid they would get news, as they did all their lives."

Contestant's wife testified that, in 1910 or 1911, she went to decedent's home and invited him to come and visit them and see his grandchildren; decedent answered, "O, well, I am not in a position to go"; decedent met her on one occasion at a church and said, "I ought to know your face but really I cannot name you"; when he learned she was Sam Hugus's wife, "he quickly turned, got lost in the crowd and did not say anything more";

again, she met decedent at a wedding and tried to make her way through the crowd to speak to him. She further testified: "I saw he was not wanting to speak to me. He went out of the door and I did not see him any other time in the evening after that."

Simon Baum, another witness for contestant, said that in 1896 or 1897 he was called upon to go to decedent's farmhouse, to do some chiropodist work for Mrs. Dorcas Nicolls, decedent's mother. He testified: "Mrs. Hanna was saying about Sam's bad doings, about his drinking and running after bad women......that Mrs. Nicolls she turned on her chair and looked at William [the decedent] and said 'William, didn't I tell you he [the son] was a bad man'......She said he was doing no good whatever, running after bad women and drinking. Q. How far was William Nicolls sitting away from his sister, Mrs. Hanna, at the time this conversation took place. A. As far as from here to the window; ...... when she said this, he just dropped his head and did not say anything"; upon another visit by Baum to the farmstead for the purpose of cutting decedent's hair, the latter's mother said, "Sam was doing no good; he was drinking and running after bad women"; that "William paid no attention; he was so tired of it." Upon another occasion, in 1903, he heard Mrs. Hanna, decedent's sister, say, "I was just telling Mr. Nicolls about Sam again"; Baum testified that, at a later time, he met decedent, who told him, "Things are going to ruin; ...... just to think, they have elected Sam, my son, as school director; he is no more fit than I am."

Squire Graham testified for contestant that sometime in 1910 decedent said to him, "Have you heard about Sam Hugus?" that he replied, "Yes, I heard something, but I did not know whether there was anything in it." Then decedent said, "It is true, only too true." Decedent further said he, the son, had lost his money; it was his own fault; he had squandered thousands of dollars drinking and running after bad women. Again, the

following remark is attributed to decedent: "I was not able to help him, but I would have felt like doing so if he had not acted as he has"; upon another occasion decedent said his son "had been such a dirty dog."

On the other hand, the testimony produced by plaintiffs is uniformly to the effect that decedent was a man of sound business judgment; that he never was on more than speaking terms with his son; that he was a director of a bank, several of his fellow directors testifying he was a firm, determined man who used good judgment in handling the affairs of others as well as his own, and it was always his fixed idea to disinherit his son because of his unfilial attitude; further, that he had consulted numerous attorneys to make certain he could do so.

It is undisputed that the will and codicils were drawn by attorneys, at testator's request, and without any apparent outside influence operating on his mind then or on the occasions of their execution.

Verdict and judgment for defendant. Plaintiffs appealed.

*Error assigned,* inter alia, was refusal of plaintiff's motion for judgment n. o. v., quoting record.

*Charles C. Crowell,* with him *Bell & Bell,* for appellants.—There was no sufficient evidence of undue influence to submit to the jury: Wainwright's App., 89 Pa. 220; Johnson's Est., 159 Pa. 630; Allshouse v. Kelly, 219 Pa. 652; Watmough's Est., 258 Pa. 22; Kustus v. Hager, 269 Pa. 103; Alexander's Est., 246 Pa. 58; Canfield v. Barnes, 234 Pa. 528; Tyson's Est., 223 Pa. 596; Wilson's App., 251 Pa. 223; Englert v. Englert, 198 Pa. 326; Tetlow's Est., 269 Pa. 486.

*James S. Moorhead,* with him *Robert W. Smith,* for appellee.—The case was for the jury: Herster v. Herster, 122 Pa. 239; Boyd v. Boyd, 66 Pa. 283; Robinson v.

Robinson, 203 Pa. 400; Watmaugh's Est., 258 Pa. 22; Phillip's Est., 244 Pa. 35; Conway's Est., 257 Pa. 314.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, January 3, 1922:

Nine separate appeals, which we shall dispose of in one opinion, are before us in the present case, all taken by beneficiaries under the will of William A. Nicolls, deceased, from a judgment, entered pursuant to a verdict for the contestant, in an issue devisavit vel non, granted by the orphans' court, and certified to the Common Pleas of Westmoreland County, for trial of the following questions: "(1) Whether or not the paper writings alleged to constitute the last will and testament of William A. Nicolls were procured by fraud or undue influence, operating on the mind of testator and controlling the disposition of his property to the extent that he gave it to collateral heirs instead of his lineal descendant? (2) Whether the will of testator is inofficious or unnatural? and, (3) Whether the probate of this alleged will should be set aside and the letters testamentary ......revoked?"

Upon an investigation of the record, we have reached the conclusion that there was no evidence produced sufficient to carry the case to the jury; therefore it is necessary to consider only the twelfth assignment of error, which complains of the refusal of judgment non obstante veredicto.

Contestant, who was defendant in the court below, is testator's son; his father and mother were married in 1865, and lived together about a year, when they separated permanently, Mrs. Nicolls returning to her parents' home, where contestant was born January 7, 1867. On March 31, 1869, Nicolls was granted an absolute divorce from his wife, and contestant grew to manhood in his mother's care, adopting her family name and calling himself Samuel O. Hugus. April 2, 1898, decedent made the will here in controversy, and subse-

quently executed two codicils, dated November 24, 1911, and November 6, 1913, respectively; he died October 8, 1914. By the terms of the will and codicils, testator's property was given to certain collateral heirs, none going to contestant.

The court below, while apparently agreeing there was no direct evidence of fraud or undue influence, operating on the mind of testator, at the times the will and codicils were executed, nevertheless thought sufficient facts and circumstances, indicating such to be the case, appeared to warrant the submission of the issues involved to the jury.

Appellee's counsel devote their brief of argument to the point that there was evidence to justify the course pursued by the trial judge, but to this we cannot agree.

The law on the general subject in hand has been so thoroughly considered by us in several recent cases, it would serve no useful purpose to go over the field again at this time: see Phillip's Est., 244 Pa. 35; Herr's Est., 251 Pa. 223; Gongaware v. Donehoo, 255 Pa. 502; Warton's Est., 256 Pa. 201; Watmough's Est., 258 Pa. 22; White's Est., 262 Pa. 356; Kustus v. Hager, 269 Pa. 103; Tetlow's Est., 269 Pa. 486. It is sufficient to say, we have before us a case where the testator had the benefit of advice of counsel, and his will was executed, at a time when none of the beneficiaries were present, pursuant to an oft-repeated, openly expressed intention to disinherit a son who had so far repudiated his father as to refuse his name; which fixed purpose was deliberately persisted in over a period of sixteen years, as evidenced by the republication of the will on two occasions; while, on the other hand, to strike down this solemnly made and twice republished testamentary instrument, we have a mere mass of oddly assorted circumstances and inconclusive statements, in which, together or singly, no good reason can be found to justify that course.

The evidence was insufficient to carry the case to the jury, and the court below erred in submitting it, as may

be seen by considering the facts hereinbefore stated and those shown by the testimony published in the notes of the Reporter.

The judgment is reversed, and judgment is here entered for plaintiff.