## Brehony, Executor, v. Brehony.

*Issue devisavit vel non—Verdict of jury—Setting aside verdict—Evidence.*

1. On the trial of an issue *devisavit vel non,* the trial judge sits as a chancellor and is not bound by the verdict and should not sustain it against the manifest weight of the evidence.

*Wills—Probate—Issue devisavit vel non—Forgery—Evidence—Shifting of burden of proof.*

2. In a will contest involving the question of the forgery of the decedent's signature, where the proponent shows by the evidence of the two subscribing witnesses and a third person, although such third person is sole beneficiary, that the decedent requested the witnesses to sign the paper as witnesses, that she had dcelared that she knew its contents, and that with her hand, guided by that of the beneficiary, she made the signature, the burden of proof is shifted from the proponent to the contestant.

3. In such case, the testimony of the three witnesses is sufficient to establish, *prima facie,* a proper execution of the will, for a testratrix, enfeebled, may engage another to assist her in signing her name by guiding and steadying her hand while in the act of signing, and such assistance does not invalidate the will.

*Wills—Probate—Signature—Opinion of handwriting expert—Forgery—Assistance in signing—Reading paper—Time of signing—Act of June 7, 1917.*

4. Where the two subscribing witnesses to a will and another witness testify that the third witness, with his right hand over testatrix's, guided her right hand and thus put her name to the paper, a handwriting expert will not be permitted to express an opinion that the signature attached to the will could not possibly have been made in the manner described by the witnesses.

5. The purpose of the Act of June 7, 1917, P. L. 403, requiring every will to be signed at the end thereof, is not to furnish in the handwriting evidence of identity and protection against fraud, inasmuch as the authentication of the will, as before the act, is dependent upon the required witnesses, and the mode of execution left unfettered.

6. When a testator requires aid to write his name by having another guide his hand, the extent of the aid, so long as it is assistance merely, is immaterial, providing the testator's part in thus affixing the signature to the will is of his own volition.

7. In such a case a handwriting expert, upon a comparison of normal signatures of testatrix and the assisted signature, will not be permitted to give his conclusion that the testatrix had no superintendence, either mental or physical, over the act of signing.

8. The fact that a will is not read in the presence of the witnesses, who have testified that they attested it, is not material, for, even though testatrix was unable to read the paper, the presumption is that she knew its contents before signing.

9. An allegation of fraud or forgery negatives an allegation of undue influence.

10. Proof of the precise hour when a will is alleged to have been executed is not essential to its validity.

11. A verdict of the jury against a will, on the ground that the signature was forged, will be set aside where the court finds that the verdict was against the manifest weight of the evidence.

Rule for judgment *n. o. v.* C. P. Schuylkill Co., May T., 1924, No. 540.

*James A. Noecker, John J. Moran* and *M. M. Burke,* for plaintiff, proponent.
*A. D. Knittle* and *M. A. Kilker,* for caveator, defendant.

BERGER, J., Sept. 13, 1926.—In this issue *devisavit vel non* a verdict was. rendered for the defendants, the contestants, and against the plaintiff, the proponent of the will, who has filed motions for a new trial and for judgment *n. o. v.* The only issue certified into the Common Pleas for trial is as follows: "Whether the signature to the writing alleged to be the last will and testament of Mary Brehony admitted to probate by the register of wills is or is not the signature of Mary Brehony, or whether the name affixed thereto is a forgery."

On the trial of an issue *devisavit vel non*, the trial judge sits as a chancellor, and is not bound by the verdict, and should not sustain it against the manifest weight of the evidence: Englert *v.* Englert, 198 Pa. 326; Keller *v.* Lawson, 261 Pa. 489; Kustus *v.* Hager et al., 269 Pa. 103, 106; Tetlow's Estate, 269 Pa. 486, 495, 496; Kesler et al. *v.* Hugus, 271 Pa. 512.

The jury found that the will was forged. The question raised by the plaintiff's motion for judgment *n. o. v.*, therefore, is that of the sufficiency of the evidence, in the light of the applicable principles of law, to sustain the verdict of the jury. The testatrix, because of impairment or loss of vision for a period of about four years immediately preceding the alleged execution of the will, March 15, 1920, was unable to write her name, unassisted, to any instrument, and the date of her last signature, proved by the defendants at the trial to have been in her own handwriting, was an endorsement on a check payable to her order, dated Oct. 4, 1913. The proponent of the will called James Brehony and Peter Brehony, the subscribing witnesses, to prove its execution, and their testimony is the same in every essential particular. Each of them identified the alleged will by his own signature affixed thereto as a subscribing witness, and each of them said that he saw Mary Brehony, in the presence of the other, affix her name at the end of the will, on March 15, 1920, the date on which it purports to have been executed. Illness at that time confined Mary Brehony to her bed, and they went to her bedroom in response to a call which came from it, made by her brother William, their uncle, and when they entered the room, she was in bed with a paper in her hand—which they later attested—and she said, "Jim and Pete, this is my will. Willie read it for me, and I know what is in it, and I want both of you to sign it." She also said she could not see the paper, and then asked her brother William to assist her in putting her name to it. William propped her up in bed, and standing on the left side of the bed on which she lay at the time, put his right arm around her waist, guided her right hand with his right hand over hers, and thus put her name to the paper, which lay upon a photograph, which was supported by the bed clothes, during this joint act of affixing her signature. James Brehony and his brother, Peter, then and there affixed their signatures as subscribing witnesses, and William took the paper, after having been requested by her to take it and put it away carefully. The testimony of William Brehony in respect to the manner in which the will was executed is in accord with that of the subscribing witnesses.

The testimony of these witnesses was, therefore, sufficient to establish, *prima facie*, a proper execution of the will, for a testator, enfeebled, may engage another to assist him in signing his name by guiding and steadying his hand while in the act of signing, and such assistance does not invalidate a will: McClure *v.* Redman, 263 Pa. 405, 409; Hopkins's Estate, 277 Pa. 157, 158. See, also, Novicki *v.* O'Mara, 280 Pa. 411, 415, 416; Girard Trust Co., Exec'r, *v.* Page et al., 282 Pa. 174. The burden of proof to establish that the paper, which was admitted to probate by the register of wills, was a forgery, was, therefore shifted to the defendants by the evidence offered by the plaintiff in making out his case in chief: Logan's Estate, 195 Pa. 282, 283; Lawrence's Estate, 286 Pa. 58, 64.

The theory of the defendants respecting the alleged forgery of the will, deduced from the manner in which the case has been presented, is that the paper purporting to be the last will and testament of Mary Brehony was neither submitted to nor executed by her, in the presence of the attesting witnesses whose names are attached thereto, nor at any other time. It is to

be kept in mind that the sole issue for determination is whether or not the will was forged. Forgery is "The fraudulent making or alteration of a writing to the prejudice of another man's right:" 4 Blackstone's Comm., 247. This may be done by the application of a true signature to a false instrument, for which it was not intended, or *vice versa.*

The contestant has centered his attack upon the execution of the will around two points, namely, that the signature attached to the will could not possibly have been made in the manner in which William Brehony, the only beneficiary under the will, and the executor of it, and the two subscribing witnesses said that it was made; and, second, that at the time they testified that the will was executed, they were not in the house of Mary Brehony. T. C. Knowles, a handwriting expert, was the only witness who was called to establish the first proposition, and he was permitted to testify, over plaintiff's objection, that the name Mary Brehony, as it appears at the end of the alleged will, could not have been made in the manner described by the subscribing witnesses and the beneficiary under the will. In Kimmel's Estate, 278 Pa. 435, 439, 31 Am. Law. Reps. 678, it was pointed out by Simpson, J., citing Vernon v. Kirk, 30 Pa. 218, that the purpose of the legislative enactment (Section 2 of the Act of June 7 1917, P. L. 405), requiring every will to be signed at the end thereof, was not to furnish, in the handwriting, evidence of identity and protection against fraud, for the authentication of a will, as theretofore, was dependent upon the required witnesses, and the mode of execution left unfettered. In Fritz v. Turner, 46 N. J. Eq. 515, 22 Atl. Reps. 125, the signature of the testator—who was so weak that he had to be assisted to arise—was, after he had arisen, affixed to the will in clear characters with the assistance of the draftsman who steadied his hand, and the dispute being, upon contradictory evidence, whether the testator could write at all, it was held to be unnecessary, in determining the validity of the will, either to attempt to reconcile the conflicting testimony bearing on the testator's ability to write, or to determine precisely how far the draftsman of the will controlled the testator's hand. In re Kearney's Will, 74 N. Y. Supp. 1045, an attorney, at the request of the testator, took his hand which held the pen into his own, and, without touching the pen, guided the testator who, because of illness, either could write only with difficulty, or not at all, in affixing his name to the will. Notwithstanding an expert, who was called by the contestant of the will before the surrogate, gave it as his opinion that the testator had no superintendence, either mental or physical, in the act of affixing his signature, the will was admitted to probate, and an appeal was taken. In passing upon the question whether the testimony of the expert was sufficient to show that the subscription of the will was not the act of the testator, it was held by Jenks, J., that when a testator requires aid to write his name by having another guide his hand, the extent of the aid, so long as it is assistance merely, is immaterial, providing the testator's part in thus affixing his signature to the will is of his own volition. In other words, the validity of the signature, affixed in such circumstances, depends not upon the extent of the physical aid furnished, but upon whether it was physical assistance merely, or constituted control of the testator's mind. The expert, basing his opinion solely upon a comparison between two normal signatures of the testator and the assisted signature, was permitted to give his conclusion that the testator had no superintendence, either mental or physical, in the act of signing, although he refused to say that the testator's hand had not touched the pen when his name was affixed to the testamentary paper. The grounds given for his conclusion were, "that when two hands are trying to make a signature with

two mental conceptions, they run riot, do not act in unison, and the result is a scrawl and comparative illegibility." Jenks, J., refused to accept the expert's conclusion that the testator had neither mental nor physical control over his signature thus affixed, against the positive testimony of intelligent and comparatively disinterested witnesses, saying: "The testator's mental conception that he desired to sign the will may have been entirely clear, and yet his relative physical power, compared with that of the assistant, may have been almost *nil.* His mind may have willed the physical action of signing, and yet his hand may almost have refused to obey his mind, so that when his hand was taken in the hand of a man in good health, it may have been almost passive, or have yielded almost absolutely to the superior force, so as to have lost the power to make its own peculiar letters. Yet so long as there was the conscious wish of the testator that his hand should make the signature, and he participated in any degree in the making of it, and acquiesced in and adopted the signature thus made, it was sufficient. Thus the physical contribution of the testator might be so slight as not to present the condition of two hands trying to make a signature, when each alone was physically capable to make it, and each would strive to make it in its own way. An eminent writer has said that, even on questions of handwriting, a jury is bound to accept the opinion of an expert employed by a party calling him 'as an argument, rather than proof, and to make allowance for all of the disturbing influences by which the judgment of the expert may be moved.' 1 Whart. Ev., § 722."

Mr. Knowles, the handwriting expert in this case, called by the contestants, in answer—over plaintiff's objection—to a hypothetical question submitted to him, said that the name "Mary Brehony," at the end of the testamentary paper alleged by the proponent to be the joint act of Mary Brehony and her brother William, could not have been the result of their joint effort. He reached this conclusion without knowing what proportion of the alleged joint effort to produce the signature either furnished, and based it exclusively upon his belief that the name appended to the testamentary document, which is written upon ruled paper, could neither have been placed so well on the line upon which it appears, nor be so clear and intelligible as it is, even if it was made entirely by William's effort, with only so much touching of his sister's hand as to indicate her assent to the act of signing.

In McClure v. Redman, 263 Pa. 405, the signature of Mrs. Redman, who was physically unable to write, was affixed to a paper which she intended to be her will by a Mrs. Oskin, at her request, by placing her right hand over that of Mrs. Redman, and assisting her to attach her name thereto. Mrs. Oskin also signed as a subscribing witness, but there was no other. In an attack upon the will an issue *devisavit vel non* was directed to determine the question whether the affixation of Mrs. Redman's name to the paper under these circumstances was a legal execution of it as her will. The testamentary paper, not having been signed in the handwriting of Mrs. Redman, was required to be proved by two or more competent witnesses. Since only one person, the subscribing witness, was present at the execution of the paper, the proponent of the will sought to supply the want of another competent witness by the testimony of expert and non-expert witnesses that the name appended to the instrument was Mrs. Redman's genuine signature. One reason why the rejection of this testimony by the trial court was held to have been correct, was that evidence such as that offered was nothing but an expression of a belief or opinion based on wholly insufficient grounds, because the disputed signature being a composite one, the joint product of Mrs. Redman and Mrs. Oskin, how much each contributed to the making of it was so purely speculative as to

render any opinion as to its genuineness of no value. In the instant case Mr. Knowles would not say unequivocally that the disputed signature either could not have been or was not affixed by Mary Brehony aided by her brother William, but merely said that it was his belief or opinion, based solely upon the manner in which the signature was placed upon the ruled line, and its legibility, that it was not so affixed. A careful consideration of Mr. Knowles's testimony, and the cases cited, leads me to the conclusion that his testimony was inadmissible, on the ground that, under the facts as stated in the hypothetical question, the probability that the signature was produced as proponent and his witnesses testified, can be estimated by all men, without special knowledge or training, thus precluding opinions of witnesses, either expert or non-expert. See Schuette v. Swank, Receiver, 265 Pa. 576, 583.

On March 15, 1920, the date on which the proponent of the will alleges its execution, Mary Brehony was living in a double house at Mahanoy Plane, one-half of which was occupied by her and the other half by her brother, William B. Brehony. They had then lived in this house for a period of thirty-five years. Mary was a spinster, her brother, William, was a widower, and their nearest living relatives were nephews and nieces, the issue of brothers and sisters. Neither kept any servant and each maintained an independent household. Each side of the double house in which they lived had its own stairway leading to the second floor of each from the kitchen, which was in the rear on the first floor of each house, but there was direct communication between the two kitchens, and between two adjoining bedrooms on the second story front, by a door leading from one kitchen to the other, and another door similarly connected the two bedrooms. These communicating doors were for the convenience of the parties, and, so far as the evidence discloses, were not locked at any time during the entire period of thirty-five years in which the houses were thus in use by brother and sister. William Brehony for many years conducted a small store on his side of the house, and he and his sister were in moderate financial circumstances. The value of her estate consisting of realty and personalty was $25,000 to $30,000. Mary Brehony was seventy-five to seventy-eight years of age, and her brother William about sixty-five. Each was in failing health and Mary's sight was very bad. William R. Middleton, a justice of the peace for thirty-seven years in the borough in which they lived, had known both for a number of years, wrote fire insurance upon their properties, and acted as scrivener for them in their business transactions. Mr. Middleton was an occasional caller at William's store and met Mary Brehony there during the latter part of April, 1920, in William's presence. She told Mr. Middleton she had made no will and inquired, in William's presence, whether he wrote wills, to which he said, yes. She then said she would probably send her brother William to his house to have her will drawn, and his best recollection is that she told him that she intended to will her estate to her brother William. On Sunday evening, March 14, 1920, William Brehony appeared at his house to have his sister Mary's will written, and told him it was her wish to make him her sole beneficiary and executor. Mr. Middleton carried out these instructions at once by writing the testamentary paper, which he identified in court, on a typewriter. William, after its completion, asked Mr. Middleton to bring it to the house the next morning, Monday, March 15, 1920, for the purpose of execution, but he refused to do this, because he was under summons to appear as a juror at Pottsville on that day, and William left, taking the paper with him. The will was executed, according to the testimony of William Brehony and James and Peter Brehony,

about 8.15 or 8.20 A. M., Monday, March 15, 1920, in the manner already detailed.

Mary Brehony became ill March 11, 1920, and died March 25, 1920. James Brehony slept at his aunt's house every night during her illness, but his home at the time was with Stella Brehony, his sister, with whom his brother, Peter, also lived at that time. Stella Brehony testified that, beginning with Saturday evening, March 13, 1920, she stayed with her aunt Mary every other night, and that Margaret Ryan, her cousin, stayed with their aunt every other night, beginning with Sunday, March 14, 1920. A nurse, Margaret Bronzo by name, came in on March 16, 1920, and stayed until Mary Brehony's death, which was caused by bronchial pneumonia.

William Brehony kept possession of the paper which proponent contends is his aunt Mary's will until April 5, 1920, when he had it probated. The delay in probating the will was due to the fact that the Sunday following the funeral he went to a hospital in Philadelphia, where he submitted to an operation, and, having obtained leave, came to Pottsville April 5th, and returned to the hospital again April 8th. Margaret Ryan and John Brehony appealed to the Orphans' Court, June 14, 1920, from the decision of the register of wills probating the will. March 15, 1923, before the issue was awarded, Margaret Ryan, with the consent of the Orphans' Court, withdrew as a contestant. William Brehony, the original proponent of the will and the only beneficiary, died on or about Aug. 6, 1923, himself leaving a will, under which James Brehony and Stella Brehony are the sole beneficiaries, and James also the executor, whereupon, on the petition of John Brehony, the Orphans' Court made an order Feb. 4, 1924, substituting James Brehony, executor of William Brehony, as the proponent of Mary Brehony's will.

Mary Brehony, at her death, March 25, 1920, besides her brother William, had twenty-one nephews and nieces, the issue of deceased brothers and sisters. Eight were the children of James Brehony; five, the children of Edward Brehony; five, the children of Catharine Brehony Farrel; and three, the children of Alice Brehony Ryan. The proponent of the will and his brother Peter and sister Stella are children of James Brehony; John Brehony, the contestant, a son of Edward Brehony; and Margaret Ryan is the only daughter of Catharine Brehony Ryan. The five nephews and nieces which have been named were the only ones who appear to have kept in touch with their aunt Mary. Had she died intestate, James, Peter and Stella Brehony would each have received one-fortieth of her estate; John Brehony, one-twenty-fifth of the estate; and Margaret Ryan, one-fifteenth of the estate.

Margaret Ryan is the contestant's chief witness upon whom he relies to establish the alleged forgery of the will by showing that William Brehony, James Brehony and Peter Brehony were not in Mary Brehony's room on Monday, March 15, 1920, at 8.15 or 8.30 A. M., the time fixed by them for the execution of the will. Margaret Ryan was her aunt's constant companion for some years before her death, and her aunt frequently lived with her parents at Mahanoy Plane, from October to April. Because of failing sight, her aunt required her assistance at times in going about and for the transaction of business, such as drawing checks and the like. She testified that she was called to her aunt's house about 8.30 A. M., March 12, 1920, and remained there continuously, except for short periods spent at her father's house nearby on account of his illness, until her aunt's death. She slept in her aunt's house Sunday night, March 14th, and James Brehony and Peter, she said, also slept there that night. She arose about 7 o'clock, the morning of March 15th, and heard James and Peter in the kitchen downstairs. Peter came upstairs to

her aunt's room, she said, and told her he was leaving, and she followed him downstairs and left him out of the house about 6.55 A. M., and locked the door. She then prepared some coffee for herself and returned to her aunt's room at 7.15 or 7.20 A. M., and she said that no person other than herself was in her aunt's room Monday, March 15, 1920, from 7.15 to 7.20 A. M., to about 9 A. M., when a Mrs. Cullen came in and stayed about twenty minutes. Miss Ryan also said she remained continuously in her aunt's room from 7.15 to 7.20 A. M., March 15, 1920, to twelve o'clock noon of that day, and that Mrs. Cullen was the only person in the room during that time. Her aunt, she said, had told her on Christmas Day, 1919, for the last time, that she had a will made about eight years earlier, in which she, Margaret Ryan, her uncle, William Brehony, and her cousin, John Brehony, the contestant, were the beneficiaries, and at that time Mary Brehony was on friendly terms with her brother William.

No one was produced who ever saw a will which had been made by Mary Brehony before March 15, 1920, but Margaret Ryan and some other witnesses testifying that she had a black bag in which she kept some papers, concerning which she was most solicitous, and that her brother William, during his sister's last illness, showed an unseemly interest in the bag, got possession of it and examined its contents, but returned it before his sister's death. No one said that it ever contained any will. To show that William Brehony could not have assisted his sister in signing her will at the time he fixed, Margaret Bronzo, the nurse, was called by the contestant, and she said that William Brehony was in Girardville at her home on the morning of March 15, 1920, to engage her services for his sister, about 8 or 9 A. M. She fixed the time as stated because she usually breakfasted at the hours mentioned. Girardville is a short distance from Mahanoy Plane, with communication between the two towns by rail, trolley and a public highway.

John Brehony, the contestant of the will, testified to declarations which his aunt had made to him respecting the provision which she had made or intended to make for him by will. He also testified that both James and Peter Brehony, in answer to his inquiries, made after his aunt's death and before her burial, had said to him that they had no knowledge of any will made by her.

This case has been twice tried, the jury, after a long deliberation, having failed to reach an agreement the first time. Some time between the first and second trials, John Brehony and James Brehony had conferences looking to a settlement or abandonment of the will contest, but failed to reach an agreement. Who opened these negotiations is a disputed matter between them, and the proposals made and considered were not creditable to either party, irrespective of who originated them. The testimony relating thereto was received as going to the credibility of James Brehony. John Brehony and his son, Edward Brehony, also attacked the credibility of Mr. Middleton, by testifying that he had stated to each of them that he had not seen Mary Brehony for about six months previous to March 15, 1920. Peter Brehony, who was a night telegraph operator at Mahanoy Plane for some time prior to March 15, 1920, contradicted Margaret Ryan by his testimony that he worked all night until 7.55 A. M., March 15, 1920, and then went to his aunt's house, and that he did not stay there during the night.

The outstanding undisputed facts are that Mr. Middleton wrote the testamentary paper March 14, 1920; that Mary Brehony was mentally competent, until a few hours before her death, to execute it; that she and her brother William were on friendly terms at and before the time of its alleged execution; that she had previously declared a purpose to make him either one of several or the sole beneficiary under her will; that Peter Brehony never had

Brehony, Executor, v. Brehony.

any financial interest in his aunt's will; and that James Brehony had no interest in it on March 15, 1920, and only acquired an interest in her estate through the will of his uncle William, who died in August, 1923.

In the course of the trial, counsel for the contestant made the point that the will was not read in the presence of the witnesses who have testified that they attested it, but this was unnecessary, for even though Mary Brehony was unable to read it, the presumption is that she knew its contents before signing: Hoshauer v. Hoshauer, 26 Pa. 404; Dickinson v. Dickinson, 61 Pa. 401, 407; Harrison's Appeal, 100 Pa. 458, 468; Linton's Appeal, 104 Pa. 228, 238; Spence's Estate, 258 Pa. 542, 547; White's Estate, 262 Pa. 356, 361. It was also contended that William Brehony, as a brother of Mary Brehony, and because of the intimacy of their relations, had the burden of proof throughout to establish the will, but in McClure v. Redman, 263 Pa. 405, it was clearly stated that an allegation of fraud or forgery negatives an allegation of undue influence.

Proof of the precise hour when the will is alleged to have been executed is not essential to its validity. If executed by Mary Brehony at any time after its preparation by Mr. Middleton and before her death, it is a good will. If it was not executed by her, as the proponent has sought to prove, then he and his brother Peter, at least, must have conspired with their uncle William to fabricate a will in order to permit William to acquire her property. The effect of the jury's verdict is the exact equivalent of a finding that the three men named forged the instrument alleged to be Mary Brehony's will. Guided solely by the principles stated in Tetlow's Estate, 269 Pa. 486, 495, it is my firm conviction that the contestants have failed to establish their charge of forgery, and, hence, the motion for judgment n. o. v. must prevail.

Rule absolute and judgment n. o. v. entered for plaintiff.