Wetzel *v.* Edwards, Appellant.

Argued October 28, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Edwin M. Clark,* with him *James L. Jack,* for appellant.

*L. E. Miller,* with him *Peelor & Feit,* for appellee.

OPINION BY MR. JUSTICE MAXEY, November 25, 1940:

Harry K. Edwards, aged 65 years, died on January 29, 1938. On July 6, 1936, he executed the challenged will in the presence of the appellee and two witnesses: T. E. Sharp and Hapsie C. Wetzel, the latter being appellee's wife. The will had been prepared by testator's attorney to whom appellee at the attorney's office explained what testator "wanted done," the testator having on the day previous (Sunday) told the appellee "what he [the testator] wanted in the will." Appellee testified that he made careful notes of testator's instructions. The will was read *to* testator and *by* him in his mill and he then signed it. Upon the death of testator's brother and business partner, C. D. Edwards, in 1933, appellee became a co-administrator of the latter's estate. This brought him into close association with the testator. In testator's will appellee was named executor and his wife was one of thirteen legatees. She was not related to the testator but knew him for about 40 years. The value of the estate was about $50,000. Testator had never married.

During the first part of June, 1936, the testator suffered a slight stroke of paralysis. On September 27, 1937, he had another stroke of paralysis and was required to give up his business. He remained at his home until December 22, 1937, when he was taken to a hospital, where he died on the following January 29th. His will directed that the residue, after the payment of debts, be paid to the Savings & Trust Company of Indiana, Pa., as Trustee, and that the income therefrom be paid during her life to Mary E. Edwards, the widow of decedent's brother, C. D. Edwards. Upon her death the income from the trust fund was directed to be paid to thirteen persons in equal shares. It was further provided that if

any of these legatees died that legatee's share should go to such legatee's child or children and if there were no children surviving, the share should revert to the trust fund for the benefit of the others. It was stipulated of record that in the event of the death of decedent without a will, those who *would have* inherited his estate *as his heirs at law* would have been the present appellant, who is testator's nephew, and two nieces; all three of whom are among the thirteen beneficiaries named in the will.

After decedent's removal to the hospital, the will was found by his sister-in-law, Mrs. Mary E. Edwards (mother of appellant), in a corner of decedent's dresser drawer. She described its condition as "all crumpled in a ball." In due course the appellee caused a citation to issue to the appellant to deliver up the will for the purpose of probate. The appellant objected to its probate. Following certification to the Court of Common Pleas by the register of wills, an issue was framed, with Noble H. Wetzel as plaintiff and Vernon S. Edwards as defendant, to determine the following questions: "1. Was the said Harry K. Edwards induced by fraud, misrepresentation and undue influence of Noble H. Wetzel to execute a paper as his last will and testament? 2. Did the said Harry K. Edwards destroy the said alleged will to the best of his ability animo revocandi?"

At the close of the testimony, defendant moved for (1) a verdict in favor of the defendant for the asserted reason that the will was not properly proven and (2) binding instructions generally. These motions were overruled. Plaintiff moved the court to instruct the jury to answer "No" to questions 1 and 2, and to direct the jury that under all the evidence the verdict must be for the plaintiff. The court instructed the jury accordingly and the appropriate verdict was recorded. Appellant filed motions for judgment n. o. v. and for a new trial, both of which were refused.

The court below found no basis for holding that any confidential relationship existed between the appellee and the testator. They had been friends for many years and from time to time appellee had performed certain business services for the testator. This does not make out such a case of confidential relationship as to cast the burden of proof on the appellee as one standing in a confidential relation to the testator and receiving a substantial bequest. As this court said in *Null's Estate,* 302 Pa. 64, 68, 153 A. 137: "Confidential relation . . . appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence of trust, justifiably reposed; in both an unfair advantage is possible." Appellee received no bequest. He was named as executor, but whatever his compensation as such might be was not a gift but compensation for services rendered. In *Linton's Appeal,* 104 Pa. 228, this court held that the fact that a person was made one of the executors of a will, but not a legatee or devisee thereunder, is not sufficient to cast upon him the burden of proving testamentary capacity and the absence of undue influence.

This court has frequently stated, as it did in the *Estate of Annie S. Royer, deceased,* 339 Pa. 423, 12 A. 2d 923, that "in order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind, fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of the will."

The court below pointed out that "decedent's testamentary capacity is admitted, or at least is not denied" and that "the evidence utterly fails to disclose a condition of 'extreme infirmity or mental incapacity' at the time the alleged will was executed." At that time and

for fifteen months thereafter the decedent was able to attend to his customary business of operating a mill and feed business. Dr. Stewart, who treated the testator professionally during the year 1937, described his mental condition as "intelligent enough. He could answer questions as well as I could." Dr. Campbell, the only physician called by the appellant, and who attended the testator in 1937, described him as "mentally all right."

The testimony offered by appellant to sustain the burden of proof resting upon him was of a negligible character. On the question of testator's mental capacity, one witness testified that in his opinion testator after June, 1936, "wasn't competent to do business." He based this conclusion on the alleged facts that the testator "couldn't remember who he represented" or "a certain price," and "couldn't keep his mind on business at all." He added: "I figured the man didn't understand the feed business in the condition he was in." A nurse who had known the decedent for over 40 years and who served him professionally in the year 1937, testified that after Mr. Edwards suffered his first stroke in June, 1936, "he was less able to conduct his business at the mill." W. E. Sell testified that after testator had his first stroke, he was "more nervous . . ., easy fussed up." Appellant testified as to the condition of testator after his stroke in June, 1936, as follows: "His speech was quite impaired, his facial muscles somewhat drawn." He also said that the testator "was suffering very badly from shock . . . in July, 1936." This was at the time of the funeral of W. E. Sell's daughter, Annie, who was testator's niece.

This record is barren of proof of any undue influence used upon the testator to induce him to make his will as he did. T. E. Sharp, one of the subscribing witnesses to the will, testified that when the appellee "told Harry [the decedent] to sign [the will] on this line," the latter answered: "I don't believe I should do this." The ap-

pellee then said: "The will is no good unless you do." The testator then signed the will. There was certainly nothing "coercive" about appellee's remark. The other subscribing witness testified that Mr. Edwards requested her to sign the will as a witness and made no comment. This witness when asked whether Mr. Edwards said before he signed the will: "I don't know whether I ought to do this," replied: "I didn't hear him say that. I would say he did not." Other witnesses testified that between the date of signing the will and his death, Mr. Edwards expressed some dissatisfaction with the provisions of his will. That a testator may express dissatisfaction with some provisions in his will does not prove that he was unduly influenced in making it. If he was dissatisfied with the will, he could have destroyed it and made a new will. That is what he did after Annie Sell, the chief beneficiary in his former will, died on July 1, 1936; he made the will now in controversy five days later.

The evidence in support of the claim that testator destroyed the will of July 6, 1936, by crumpling it is of no probative value. W. E. Sell and his two sons saw testator crumple a paper, the latter saying as he did so: "It is no good." Mr. Sell saw two signatures on this paper but they were the signatures of Ed. Sharp and John Gilson and not the signatures of the witnesses to the will in controversy. Appellant says in his paper book, after referring to the testimony of Sell, Sr., and his two sons: "From the testimony, it appears that the particular paper crumpled up at that time was not the will, but it is highly persuasive that this was the method used by Edwards to destroy a paper of which he wished to dispose, and that he believed such method was a sufficient destruction of the paper." No court would be warranted in submitting such evidence to a jury as proof that the crumpled condition of the testator's will when it was produced after his death showed that he had destroyed it animo revocandi. There is nothing in our law which

provides that a will may be revoked by crumpling, and to crumple a paper is certainly not to destroy it. There is no certainty that the will was crumpled *by the testator*. On this point the court below says: "There was no semblance of a tear therein [i. e., in the will]" and the "decedent performed no act evidencing an intention to revoke the purported will . . . although it was continuously in his keeping and he possessed sufficient physical and mental capacity to do so. . . . There is no place for a contention that decedent was at any time so physically disabled that he could not tear paper. In so far as the evidence discloses, the paralysis affected his left arm, and there are many ways in which the paper could have been held and torn by the use of his right arm." The court also pertinently said: "Since the purported will was found in his dresser drawer after his removal to the hospital, it must be assumed that he did not take it with him to the hospital. There is nothing in the evidence to show that this drawer was under lock and key, or even that decedent's room was locked to prevent any person from entering. . . . Where circumstances merely are relied upon to prove that the 'crumpled' condition of decedent's will came about through an effort on his part to destroy it, and no witness saw him do it, we cannot leave out of consideration the fact that there existed the ability and opportunity for someone else to have done it. . . . The evidence is not sufficient to justify a finding that decedent had destroyed his will."

There is no merit in the assignments of error based upon the refusal of the court to permit the subscribing witnesses to reply to questions by the appellant as to whether or not testator knew what the contents of the will were. On no theory was such testimony admissible. It is presumed that when a testator executes a paper purporting to be a will and prepared at his direction, "it is valid, though not read to or by him" at the time he executes it. See *Hess's Appeal*, 43 Pa. 73.

President Judge CREPS of the court below appropriately said: "No right of a citizen is more valued than the power to dispose of his property by will. . . . His . . . last and final direction should not be struck down except for the clearest reason." The not unusual disappointment of certain heirs of law, with the provisions of a testator's will, and evidence of certain infirmities of a testator which are not uncommon incidents of advancing years, constitute no reason for giving a jury the right to set aside a will made by a testator who apparently knew what he was doing and acted on his own judgment.

The decree is affirmed at appellant's cost.