Johnson Estate

408

*Saul, Ewing, Remick & Saul,* for accountant.

*David Berger,* City Solicitor, *Karl I. Schofield, Jacob Kalish* and *Jacob J. Siegel,* Assistant City Solicitors, for City of Philadelphia.

*Drinker, Biddle & Reath,* for remaindermen.

*Grubb, Guest & Littleton,* for minor beneficiaries.

*Edward M. Goldsborough, Louis Marion* and *Lois G. Forer,* for Commonwealth.

KLEIN, P. J., December 17, 1958.—Testator, John G. Johnson, who was one of America's foremost lawyers, died on April 14, 1917. Beyond the demands of his profession, his interest was centered principally in the collection of art objects. He spent many years of his life and most of his fortune in assembling what was without doubt one of the most interesting and important private art collections of his time. When he drew his will in 1912, his primary concern was the manner in which his prized collection would be preserved and exhibited for public view, after his death. He provided for a gift of the collection to the City of Philadelphia, conditioned upon the city arranging for the construction of a proper building to house the collection. He outlined in great detail his wishes with respect to the care of the collection in paragraph fourteenth, which provides:

"FOURTEENTH. I make the following disposition of what I have designated as my art property, with the direction that, . . . although it may be maintained in an Art Gallery in which other pictures or works of art are shown, the collection must always be kept to-

gether as a whole and must not be mingled in any way with any other collection or paintings or works of art.

"At the present time, there is no building in the City of Philadelphia capable of properly exhibiting the same, and it would be necessary that one be built. I care nothing whatever for architectural effect. What I want erected is a building constructed in the best way, properly to exhibit the pictures.

"If the City of Philadelphia takes the collection, and if there be not a proper building in existence for exhibiting the same, then I direct that such a building must be erected upon some central site, in the City of Philadelphia, or at some proper and accessible point in Fairmount Park.

"An architect should be selected, with sufficient knowledge to understand the special needs of an Art Gallery. The central gallery should not, as is usually the case, be so high as to fail to give proper illumination to the paintings. Low ceilinged side galleries, such as exist in the Kaiser Friederich Museum, at Berlin, in connection with a central gallery seems to me to be the most judicious method of construction, although, of course, I do not mean to give any binding instructions in this respect. In the Berlin Museum, the side galleries not only have a side light, but also a top light, and I know of nothing better in the way of making a proper exhibition. Of course the building ought to be as nearly fire proof as the best science will permit to be erected.

"With this general statement of my general ideas upon the subject of a proper gallery, I give and bequeath all my Art property to the CITY OF PHILADELPHIA, if, within six (6) months of my decease, it will enter into a legal authorized contract with my Executors, which will embody, inter alia, substantially the following conditions:—

"(a) The erection of an Art Gallery shall be commenced as soon as practically possible after the expiration of said six (6) months, and shall be pushed with all reasonable expedition, to completion, located on some site in the City of Philadelphia, such as I have specified, which will be reasonably fire proof and will be well adapted to the proper exhibition of the Collection.

"As I have said, this building may be one which is capable of exhibiting other art objects and collections, provided, always, that thoroughly good places are provided for the separate housing and exhibition of the Collection.

"If it shall happen that, before my decease, a proper Art Gallery, suitable, in the judgment of my Executors, for the proper display of the Collection, shall have been erected or shall be in course of erection, upon such site as I have designated, then it shall not be necessary to contract for the erection of a new building; but to contract, if the building is in course of erection, for its completion, without delay, or if it has been completed, for its maintenance and replacement in case of fire or destruction. My Executors must determine whether any such building, erected or in course of erection, is suitable, and their determination shall be final, and, if it be favorable, shall save the duty to contract for an entirely new building. If, however, they think the site chosen, or the building erected or in the course of erection, is not suitable, then the contract shall be unrestrictedly as I have outlined it in the early part of this paragraph.

"(b) The building shall be such as shall be planned by an expert architect, with sufficient knowledge of the wants of Art Galleries to devise a proper plan embodying the best suggestions to be gotten from other Galleries. This provision of the contract shall be sub-

ject to what has been already suggested in case a suitable building has been erected or is in course of erection.

"(c) The City will, from time to time, expend such sums as may be needed in and about the care, reparation and maintenance of the Gallery and of the Collection. A proper conservation of paintings, especially old ones, requires constant attention. Unintelligent reparation will lead very rapidly to their ruin.

"(d) The City must provide a sufficient force of employees to care properly for the building and to see that the Collection will be properly exhibited under proper guards.

"(e) The City must also provide a Curator who shall be paid such a salary as is requisite to obtain a person of proper intelligence and skill. From this Curator, from time to time, will come the suggestions as to what will be needed in the way of conservation and reparation, and proper care. I wish no Curator to be appointed for political reasons, and therefore direct that no one shall be appointed excepting with the approval of the Trustees of my residuary estate. I request that these Trustees will keep themselves informed by competent persons, where vacancies in the position required to be filled, so that a person properly skilled, alone, may be employed.

"(f) The Trustees of my residuary estate shall have the power to enforce the performance of this contract from time to time.

"(g) In case of destruction of the Art Gallery, unless the Collection shall also be destroyed at the same time then the City must restore or rebuild the destroyed building with all reasonable promptness.

"No paintings shall be sold, which form a part of the Collection.

"(h) The architect of the building shall be one whose appointment shall be approved by my Executors."

His residuary estate he devised and bequeathed to the Pennsylvania Company for Insurances on Lives and Granting Annuities, now the First Pennsylvania Banking and Trust Company, as trustee for a period to terminate 21 years after the death of the last survivor of his son, Edward Morrell, his daughter, Ida Norris, his grandson, John Norris, and his granddaughter, Margaret Hunt Ridgley, only the latter of whom is stated to be still living. The will, as modified by the codicil, provided for the payment of certain annuities, of which the annuities of $18,000 a year to Margaret Hunt Ridgley, and $6,000 a year to each of Nancy Morrell Norris and John Powel Norris, minor children of John Norris, for whom the Liberty Real Estate Bank and Trust Company is stated to be guardian, are still being paid. Nellie McDonnell, or McDonald, annuitant of $400 a year, appears from the supplemental statement of proposed distribution to have died on November 17, 1956, since the filing of the present account, and her annuity is stated to have been paid in full. Upon the death of Edward Morrell, without descendants, which is stated to have occurred on September 1, 1917, testator directed that the residuary income should be applied to the expenses of the museum and art collection, referred to above, and that to the extent that same should be insufficient, the City of Philadelphia should agree to pay the deficiency. He also directed that any balance of the residuary income should be paid to the University of Pennsylvania.

In 1917 Mr. Johnson executed a codicil in which he changed completely his directions with respect to the housing of his art collection. In this codicil he devised his home, situated at 510 South Broad Street, Philadelphia, to the City of Philadelphia and directed it to maintain the property as a public museum for the

exhibition of the collection. The pertinent provisions of the codicil are as follows:

"Lastly. I devise to the CITY OF PHILADELPHIA, if it accepts the bequest to it in my Will and enters into the specified contract, concerning my Art objects, my house and lot No. 510 South Broad Street, with all the appurtenances, and all the contents, saving money securities, and objects of personal use and ornament. All objects of household use and adornment shall go with the house. I wish it to be maintained as a Museum —a Public Museum—to stand pretty much as it will be at my decease.

"I direct that it shall be forever kept up and maintained as such Museum in which my Art objects shall be exhibited.

"This devise will save the need of the City contributing to build an Art Gallery, unless the house shall be so injured or destroyed as to require repairing or rebuilding. In such event the City's contract shall oblige it, if there be enough Art objects left to make it worth while, to restore or to rebuild on the same site. *So far as the original directions about a building, in my Will shall be reasonably applicable, they shall be followed.*

*"The Art objects shall not be removed for permanent exhibition, to any other place, unless some extraordinary situation shall arise making it exceedingly injudicious."* (Italics supplied.)

A printed copy of testator's will and codicil is annexed hereto.

The fund presently accounted for was awarded to the present accountant by the adjudication of this court, stated in the account to have been confirmed on March 22, 1944, (November 22, 1944, according to the statement of proposed distribution) and the present account is stated to have been filed for confirma-

tion and for the determination of certain questions, as hereinafter recited . . .

The statement of proposed distribution contains the following statement of the principal question submitted to the court for determination:

"(g) (1) A petition has been presented to the Auditing Judge by the accountant, joined in by the City of Philadelphia and the University of Pennsylvania, for an order directing exhibition of the Johnson Art Collection at the Philadelphia Museum of Art until further order of the Court, and for an order directing sale of premises 510 South Broad Street, the purchase money to be accounted for and paid over to The Pennsylvania Company for Banking and Trusts as Trustee under the decedent's Will for the maintenance of the art collection. The petition is based on the proposition that the situation at 510 South Broad Street is and has been for a number of years such as to make it exceedingly injudicious, if not impossible, to exhibit the object of art at that location, and that the Museum of Art is an appropriate and suitable place for their permanent exhibition."

Subsequently, a comprehensive petition was filed by the trustee, in which much of the history of the trust is set forth in detail. In this petition, the trustee averred, inter alia:

"6. The gift of both the real estate and the Art Collection was, by the terms of the Will and Codicil, conditioned upon the execution of an agreement by the City of Philadelphia whereunder it would undertake to comply with the terms of the Will. On October 8, 1917, the City of Philadelphia entered into such a written agreement with petitioner, a copy of which is attached hereto and marked Exhibit 'B'.

"7. In 1921 the City presented a petition asking leave of your Honorable Court to sell premises 510 South Broad Street and to apply the proceeds of the

sale toward the cost of building a separate art gallery on the Parkway. An answer was filed on behalf of a taxpayer and after extensive hearings the Master recommended that the prayers of the petition be granted, but that the proceeds be appropriated toward the erection and completion of the Art Museum which is now situated in Fairmount Park, the Johnson Collection to be exhibited in a wing thereof. Exceptions were filed and were sustained by your Honorable Court and the petition was dismissed for the reason that 'we have examined the testimony with care and fail to discover any sufficient reason why the site selected and devised by Mr. Johnson should not be used as he said it should be . . .' Johnson's Estate, 30 Pa. Dist. 387, 390 (Phila. O.C. 1921).

"8. In 1933 the cost of maintaining the Gallery and the buildings were so prohibitive that Petitioner which has complete management of the Art Collection in its capacity as trustee, arranged to have the collection temporarily housed and displayed in the Art Museum on the Parkway. A special gallery clearly identified as housing the Johnson Collection was constructed at the expense of the City of Philadelphia solely for the purpose of displaying the Johnson Collection.

"9. A careful check of the number of persons who viewed the collection has been maintained by Petitioner from the date the pictures were first displayed. Attached hereto and marked Exhibit 'C' is the record of persons who have visited the site at 510 South Broad Street and at the Art Museum since the pictures have been displayed. Reference to this exhibit will show that the largest number of persons who viewed the collection in any one calendar year while it was located at 510 South Broad Street was 11,388, whereas during the first year the collection was housed at the Art Museum the attendance was very nearly 100,000 per-

sons and in recent years the figures recorded have been far in excess of that number.

"12. The total cost of maintaining the Art Collection and premises 510 S. Broad Street from 1922 through January of 1954 has been approximately $1,500,000. Of this amount the City of Philadelphia, in accordance with the terms of its agreement, has expended approximately $675,000. By displaying the Art Collection at the Philadelphia Art Museum there has been a substantial saving in the expense of maintaining the gallery. The building at 510 S. Broad Street is vacant and the cost of maintenance and insurance is a continuing charge against the income of the trust without any return being had.

"13. The manifest intention of the testator was to bestow upon the people of the City of Philadelphia the cultural advantages derived from his Art Collection. This Collection contains many original masterpieces whose value cannot be measured and the destruction of which would constitute an irreparable loss. The Testator intended the Art Collection to be displayed in perpetuity. It is demonstrated by reference to the attendance records that the intention of the testator is best fulfilled by the continued maintenance of the Collection at the present location, namely, the Art Museum."

The petition concluded with the following prayer:

"Petitioner therefore prays your Honorable Court to find that an extraordinary situation has arisen which makes it exceedingly injudicious to exhibit the Johnson Collection at 510 S. Broad Street and to enter a decree directing that the collection be exhibited at the Philadelphia Art Museum until further order of the Court.

"Petitioner further prays your Honorable Court to enter a decree pursuant to the provisions of Section 963 of the Fiduciaries Act of 1949 and the provisions

of the Revised Price Act directing that premises 510 S. Broad Street be sold at public or private sale, the purchase money to be accounted for and paid over to Petitioner as trustee under decedent's Will."

By ordinance approved February 7, 1955, the city solicitor was authorized to join with the trustee in the foregoing petition. Another ordinance was passed by city council and approved by Mayor Dilworth on May 4, 1956, authorizing the city solicitor to petition the orphans' court for leave to purchase 510 South Broad Street from the estate for the erection of a health center. In conformity with the provisions of this ordinance, David Berger, City Solicitor of Philadelphia, filed a petition in behalf of the city for leave to purchase the premises in question.

On October 8, 1940, an agreement had been entered into between the trustee and the Philadelphia Museum of Art whereby the museum agreed to lease to the trustee for a period of 15 years, 12 galleries on the first floor of the museum for occupancy solely by the John G. Johnson Art Collection at a rental of $1,500 per year. The agreement provided that the administration and custody of the collection should remain in the hands of the trustees and that the agreement should be subject to the approval of the Philadelphia Art Jury and the Orphans' Court of Philadelphia County. This agreement has never been submitted to the court for its approval.

The Pennsylvania Company, as trustee, filed its first account in 1944. The fact that the art collection was being temporarily lodged at the Art Museum was set forth in the petition for distribution, but the court was not asked to make any decision with respect thereto. Accordingly, on November 22, 1944, the late President Judge Van Dusen, who audited the account, permitted it to be confirmed without making any comment concerning the location of the collection.

The trustee filed the present account, its second, on May 4, 1954, and a preliminary hearing was held on June 16, 1954, at which the present auditing judge was informed that the parties wished to have the whole situation reviewed and to arrange for the continued housing and exhibition of the Johnson collection in the Philadelphia Museum of Art in Fairmount Park with the formal approval of the orphans' court.

The principal witness called by petitioners in support of their position was Henry Marceau, curator of the Johnson collection. Mr. Marceau is also director of the Philadelphia Museum of Art, which is situated in Fairmount Park at the end of the Benjamin Franklin Parkway. The structure is owned by the City of Philadelphia and is leased to a nonprofit corporation which operates the museum.

The general tenor of Mr. Marceau's testimony was to the effect that the Johnson mansion at 510 South Broad Street was wholly unsuited for the display of the Johnson collection and that the Philadelphia Museum of Art is an ideal location for this purpose.

Mr. Marceau testified at page 33:

"Q. Will you describe to the Court, from the point of view of a curator of an art collection, the method of exhibition of the paintings at 510 South Broad Street, and compare that to the method of exhibition at their present location at the museum?

"A. It is a well known fact, I think, in the museum profession that any residence that is converted for use as a public institution offers immediate problems with respect to public display. It offers problems, in the first place, as to security, as to fire risk, as to control of atmospheric conditions, as to proper control of visitors. The element of possible crowding in a small house and damage to works of art is an obvious problem.

"When I first saw the installation at 510 South Broad Street, I noticed that it was hampered by a number of things. One's pleasure in visiting the collection was immediately dimmed by reason of lack of light. There had been some study, which was as adequate as possible at the time, to the problem of giving artificial light, but one had a feeling of dimness in the galleries. I think probably there were three or four-foot candles being delivered on the walls, which was far below what you consider normal.

"The fact that the fire marshall at the time prohibited the use of the two upper floors for reasons of safety made it necessary to effect a crowding of the pictures not only horizontally, but vertically, making two lines of pictures, so that the top picture was hardly visible. It was displayed, but not adequately displayed."

He testified, further, at page 35:

"On the whole, at the time at the gallery, I think there were about 270 pictures shown.

"By Mr. Wells:

"Q. Out of how many?

"A. 1200. There were 728 running feet of wall space. There were 11 units of galleries. These units included all kinds of rooms. There was a stair hall, which led to the upper floors, and which counted as a display space. It was clearly rather dangerous, because if a fire started, it would have been a perfect flue for the spread of fire.

"There were 6,019 square feet, roughly, in those 11 units. We actually put in, as I say, some 270 pictures, but that meant doubling in most instances, so that by and large, one had to really look very hard to see the paintings. It was not, by any means, an ideal museum display. It was the best that could be done."

A comprehensive description of the museum building on the Parkway may be obtained from Mr. Marceau's testimony at page 51:

"Q. Will you tell me something about the physical construction of our Art Museum on the Parkway? In the first place, it is on a high piece of ground away from all other buildings. How far is the nearest building to it?

"A. The nearest structure actually is the building known as 2601 Parkway, and the Fidelity Mutual Insurance Building, which is about five or 600 feet away.

"Q. More than that.

"Mr. Wells: Yes.

"A. In other words, we are completely isolated so far as any adjacent structures are concerned.

"Q. What about the structure of the building itself?

"A. The building is fireproof, steel skeleton frame, masonary and stone construction, re-inforced concrete floors. All of the steel columns are properly fireproofed. All of the beams and girders are properly fireproofed. It enjoys a very low fire insurance rate. As rated by the Middle City Rating Bureau, we have one of the lowest insurance rates of any museum.

"Q. That means that you have one of the best physical structures to house the collection.

"A. Yes, sir.

"Q. What about lighting, storage space, and atmospheric control?

"A. Well, the building, by reason of the fact that it is such a vast structure, has its own, you might say, air-conditioning. We are not air-conditioned, and there is some question as to whether air-conditioning is the answer so far as works of art are concerned. The changes of temperature in the building are rather slow. There is a time lag of several weeks in the fall between the cold weather outside and the change of temperature inside in the building before our heating system is turned on. In the spring, when it is warm outside, the building is cool. That is very good for paintings, because oddly enough, it is not so much the

need for constant uniform conditions, although that is desirable, but it is the speed of change which is bad. In a building which is air-conditioned, and in which the air-conditioning is turned off at night, there is a sudden change, which is not good. I would say that our building is on the whole very good from that point of view.

"Lighting, of course, is excellent. We are able to provide a great deal of natural daylight in the form of windows, which many students of painting prefer to artificial light. That can't be maintained in a museum operating through the hours of the day, summer and winter. We naturally have to have supplementary light.

"Our standard of lighting, our standard of display, our standard of carding, is in the upper level of desirability.

"Q. What sort of storage space do you have?

"A. We have various storage areas. We are hoping some day to construct an area where we can have things on sliding screens. That is not possible, but we have the pictures displayed in various sections—various storage sections. The Johnson pictures are by themselves in one such area. They are hung on screens and face out, so that each picture can be seen."

Mr. Marceau's testimony was corroborated by William George Constable, curator of paintings at the Museum of Fine Arts in Boston, and George L. Stout, director of the Isabella Stewart Gardner Museum, also in Boston, two of the outstanding experts in the field of administration of art galleries in the country.

Warren R. Thompson, an engineer in charge of the fire inspection section of the Department of Licenses and Inspections of the City of Philadelphia, was called as a witness in support of the petition. He testified, with respect to 510 South Broad Street, page 58:

"A. . . . . This building is what we would classify as a type 4 construction. That is ordinary construction. It has a masonry exterior wall, and all structural members in the building are wood, that is, there are wood columns, wood joists, wood flooring.

"The building is four stories in height. It has also a basement and sub-basement under a portion of the building."

And, further, page 61:

"We would also have to impose a restriction that the public be admitted to the first and second floors only. The heating system would have to be completely replaced. There would have to be a great deal of work done on the electrical system. We would also require that this beautiful interior stairway be either removed or enclosed with fire-resistent material, because it is a chimney, and it would prevent every person who was on an upper floor from getting out of the building, or at least endanger them to a large extent with the smoke and hot gasses pouring up that stairway if an incipient fire began.

"We would also require the building to be sprinklered in order to minimize the spread of fire. However, the structural members on the interior of the building, including the roof, are wood, and they will burn despite anything you do to them.

"Q. In other words, in your opinion, it would be impossible to assure protection of any works of art against destruction by fire in that building?

"A. That is correct.

"Q. No matter what you did to it?

"A. That is about it.

"Q. In other words, you would have to tear it down and rebuild it in order to give it the maximum protection?

"A. That is correct. It would have to be upgraded from type 4 construction to type 1-A construction.

which is identical in description to the present Art Museum. You can't do that with this particular building without a complete demolition job.

"Q. Even assuming it were possible to put this building in condition whereby it might not be a hazard to the works of art in it, I see by the pictures of the neighborhood that there are adjacent to the building structures which, if they caught on fire, would contribute to the loss of the paintings by smoke or water or otherwise?

"A. Yes. Immediately to the south of it is the clothing factory, which is three stories in height. The factory is actually only on the second and third story. That type of occupancy is a good smoke generator. Unless this building were completely sealed off with a very, very effective filter system on it, there would be an excellent possibility of smoke damage to the contents of the building. The parking lots in themselves, immediately to the west and to the north, would also be a very good smoke generator."

A careful study of this record and of the testimony of petitioner's witnesses must lead to the conclusion that the Johnson residence at 510 South Broad Street was completely unsuited for the exhibition of this magnificient collection at the time the present account was filed. It is equally clear that the present temporary site of the collection in the Art Museum is a splendid location for housing and exhibiting the collection.

These conclusions, however, do not solve our problems. They merely intensify them.

Substantially the same basic averments were made by the trustee in the petition which it filed in May, 1919, stated in the petition to be 1921, requesting leave to sell 510 South Broad Street. It averred that the building in its then existing condition was unfit and unsafe for the exhibition of the paintings, that the neighborhood had deteriorated since the testator's death and

that fire risks had greatly increased. The trustee recited, further, that it had, with the approval of the city, removed the collection from the Johnson residence and placed the contents in storage in order to protect them properly. It was estimated that it would cost approximately $250,000 to repair and rebuild the house but this was considered unwise and inadvisable. The city authorities stated that it was their intention to add the necessary funds to the proceeds of the sale to erect a suitable building to exhibit the collection at another location to be selected.

The master appointed by the court, after taking extensive testimony, filed a report in which he recommended that the prayer of the petition be granted and that "the proceeds of the sale of the property be appropriated toward the erection and completion of the Art Museum in Fairmount Park, containing a wing in which the testator's art objects are to be exhibited to the public."

Exceptions were taken to the master's report. This court sustained the exceptions and dismissed the prayer of the petition in an opinion by Gest, J., dated March 27, 1921, reported in Johnson's Estate, 30 Dist. R. 387, in which he said at page 390:

"There is no substantial testimony that any extraordinary situation has arisen since Mr. Johnson's death, differing materially in this respect from what was known to him in his lifetime; and the same is true as to what is called the deteriorating character of the neighborhood. The testator had lived there for many years and knew as much about it as anyone could, for he saw it every day of his life."

In compliance with the court's decision, the gallery was accordingly maintained at the Johnson residence for a little over 12 years.

As a result of the depression, however, the income from the estate was greatly reduced and became in-

sufficient to maintain the gallery and meet the necessary costs incidental thereto. The impaired financial position of the city made it difficult to meet the deficits in operation guaranteed under its contract made in compliance with the provisions of the will.

On June 19, 1933, 510 South Broad Street was closed to the public and the Johnson Art Collection moved to the Philadelphia Museum of Art in Fairmount Park. The move was stated to be a temporary one to save the expense of insurance and the rent of storage facilities required to house about two-thirds of the pictures which could not be displayed adequately at the Broad Street property.

This closing of the Broad Street residence and the removal of the collection to the Art Museum was made without the knowledge or approval of the orphans' court. This action was not only a clear violation of the city's contract with the executors of this estate but was also in open defiance of Judge Gest's order.

This obvious disregard for the sanctity of the contract made in pursuance of testator's directions and of the solemn judgment of the orphans' court was not only persisted in but aggravated by the contract made in 1940, for the continued display of the collection at the Art Museum to which reference is made in the petition presently before us for consideration. As we have hereinbefore pointed out, in spite of the fact that this agreement was conditioned upon approval by the orphans' court, it has never been submitted to the court for such approval, although the term of 15 years for which it was made has already expired.

If the auditing judge had the uncontrolled right to dispose of the art collection as he saw fit, he would undoubtedly grant the prayer of the petition. However, we must not lose sight of the all-important fact that this collection belonged to John G. Johnson, testator.

He had the exclusive right to dispose of it in any lawful manner he chose.

Former Chief Justice Horace Stern, in Girard Will Case, 386 Pa. 548 (1956), said at page 556:

"Subject, of course, to compliance with all applicable laws, it is one of our most fundamental legal principles that an individual has the right to dispose of his own property by gift or will as he sees fit; indeed this right is so much protected that a testator's direction may be enforced even though contrary to the general views of society (see, for example, Higbee Will, 365 Pa. 381, 75 A. 2d 599), and however arbitrary, unwise, intolerant, discriminatory, or ignoble his exercise of that right may be. He is entitled to his idiosyncracies and even to his prejudices. . . . In Wetzel v. Edwards, 340 Pa. 121, 128, 16 A. 2d 441, 444, it was said: 'No right of a citizen is more valued than the power to dispose of his property by will.' In Johnson Will, 370 Pa. 125, 127, 128, 87 A. 2d 188, 190, it was said: 'But it is and always has been the law of Pennsylvania that every individual may leave his property by will to any person, or to any charity, or for any lawful purpose he desires, . . . While it is difficult for many people to understand how or why a man is permitted to make a strange or unusual or an eccentric bequest, . . . we must remember that under the law of Pennsylvania 'a man's prejudices are a part of his liberty. He has a right to the control of his property while living and may bestow it as he sees fit at his death'."

There cannot be the slightest question concerning the legality or propriety of Mr. Johnson's testamentary disposition. His gift to his fellow citizens of his art collection was a noble, altruistic deed conceived in the highest tradition of American benevolence. The art collection was his property and it was his right and privilege to attach to his gift such terms and conditions as he elected to impose. It was for him to determine how

and where he desired his collection to be exhibited. Neither the trustee, the officials of the City of Philadelphia nor the trustees of the Philadelphia Museum of Art had the right to authorize a deviation from testator's direction even though they honestly believed that their plan for administering the trust was an improvement over the testamentary plan.

The following statement, which appears at page 389 of Judge Gest's opinion in this case, is just as pertinent today as it was when he wrote it in 1921:

"If testators are given to understand in future that their purposes, the same not being in violation of law or public policy, are to be set aside because the administrators of the charity think that something else is better, charitable and public bequests of this character will certainly diminish in number and importance."

Moreover, the fact that the city had serious financial problems following testator's death is also entirely immaterial. Having accepted testator's terms for keeping the art collection in Philadelphia, and having entered into the contract required by the will, the City of Philadelphia could not thereafter repudiate the conditions of its undertaking. The contract is perpetual in nature and its provisions constitute a covenant for the duration of the existence of the city. See Alumnae Association of William Penn High School for Girls v. University of Pennsylvania, 306 Pa. 283 (1932), in which the courts prevented the university from cancelling an endowment for a free bed and returning the principal of the gift when, after 16 years the maintenance of the free bed became economically onerous.

The situation confronting us is indeed an unfortunate one and at the same time a most complicated one. The complications in this case, however, result entirely from the improper conduct of those to whom testator entrusted his precious possessions. The persons

responsible for the illegal removal of the collection must be censured for acting in complete disregard of Mr. Johnson's express wishes and in open defiance of Judge Gest's opinion.

It is obvious that the physical condition of the Johnson residence at 510 South Broad Street was so deplorable and rundown when the trustee's account was filed in 1954, that it was completely unsuitable for housing testator's magnificent art collection. This condition was brought about, however, in a large measure, by the city's neglect in caring for the building. Testator specifically provided in his codicil that if his house "shall be so injured or destroyed as to require repairing or rebuilding . . . the City's contract shall oblige it . . . to restore or rebuild on the same site. So far as the original directions about a building, in my Will shall be reasonably applicable, they shall be followed."

Instead of attempting to restore or rebuild the building, the city improperly permitted it to deteriorate into a state of complete and utter ruin. Now, after many years of evasion of its contractual responsibility, the city seeks to evade its obligations further by seeking approval of the permanent removal of the art collection to the Art Museum.

The auditing judge is most reluctant to place the imprimatur of the court on the flagrant breach of trust which has persisted so long in this case. However, the removal of the collection to the Art Museum is fait accompli. We must therefore take cognizance of the existing actualities and attempt to bring order out of this unhappy situation, in an effort to carry out as far as possible testator's clearly expressed intentions.

Mr. Johnson provided in the codicil that: "The Art objects shall not be removed for permanent exhibition, to any other place, unless some extraordinary situation shall arise making it exceedingly injudicious." (sic) Although it must be conceded that the site of the

Johnson residence is not a suitable place for the display of the art collection under existing circumstances, the auditing judge will refrain from considering the question of its permanent removal to the Art Museum or any other place at this time.

The Johnson collection is admittedly one of the finest private collections of paintings in the country, renowned not only for its great artistic values but also for its outstanding historical significance. The trust created by Mr. Johnson is perpetual in nature and the collection itself is ageless. It contains representative works of some of the world's greatest masters, spanning a period of almost 700 years. Time is certainly not of the essence. The collection will undoubtedly become even more valuable and have greater interest with the passage of years. It is therefore not imperative that the final abode of the collection be determined in this adjudication.

Moreover, the Philadelphia Museum of Art is rapidly accumulating a large assortment of paintings and other objets d'art which is filling up the space available for exhibition purposes. It is not beyond the realm of possibility that the demand for space in the museum building may become so acute in the future that it will no longer be feasible to exhibit the Johnson collection there.

The most cogent reason for delaying a final decision in this matter, however, is the tremendous change that is taking place in the physical appearance of central Philadelphia. Edmund Norwood Bacon, executive director of the Philadelphia City Planning Committee, appeared as a witness and described many of the major changes which have taken place in the general aspect of the city since 1921. From his testimony, it is clear that momentous changes are being planned for center Philadelphia and that it is impossible at this time to prognosticate with certainty what

effect these changes will have on the character or appearance of the city 40 or 50 years from now. Mr. Bacon stated at page 50, notes of testimony of April 10, 1957:

"A. I can most assuredly assert that the future plans of Philadelphia are being given very diligent, extensive, technical scrutiny by a technical staff of some sixty persons, the funds for which were provided by City Council, and by members of the Commission, which includes three members of the Mayor's cabinet and six prominent citizens appointed by the Mayor.

"It is assuredly true that the city is in a tremendous state of flux at the present time. The changes since 1921, which I reviewed, have been broad, and particularly during the last five years the changes have been of a very decisive character. It is correct to say that the impact of these changes we have only begun to understand, and that includes the impact of the direct land use changes which I mentioned, including the complete reorganization of the whole city center, which came about from the removal of the negative influence of the elevated structure on Market Street, the construction of Penn Center, the removal of semi-industrial areas and their replacement with splendid landscaped parks in connection with the Mall.

"The second great change is the development of the vast and complex expressway system extending from the city center in all directions to the hinterland. Even the influence of the Walt Whitman Bridge and its expressway in South Philadelphia will cause repercussions in the center city."

It may well be that testator, John G. Johnson, who was generally regarded as the outstanding lawyer of his day in the entire United States and who demonstrated that he was one of the Nation's ablest and most astute art collectors, was possessed of a prescience which enabled him to anticipate that some day, in the

not too distant future, perhaps, the site of his home at 510 South Broad Street might be the most suitable spot in the entire City of Philadelphia for the erection of an art gallery for public exhibition of the great collection he had accumulated in his lifetime.

The request for approval of the sale of premises 510 South Broad Street to the City of Philadelphia, as set forth in the petition, is accordingly denied.

With this conclusion, the court's problem just begins. We are on the horns of a dilemma. Although the action in removing the Johnson collection to the Art Museum was improper, two facts stand out clearly. First, that the neigborhood of Broad and Lombard Streets is not at the present time a desirable place to rebuild the Johnson property as a museum in which to exhibit the collection. Second, that the Art Museum on the Parkway is an excellent place for such exhibition and that while the collection has been housed there, it has received the best of care and attention and has been exhibited under the most favorable conditions.

Under these circumstances, it would be unwise, because of the existing breach of trust, to jeopardize the future safety of this valuable art collection, and to deprive the general public of the pleasure of viewing it until the question of its permanent home is finally decided. Accordingly, permission is hereby granted, albeit reluctantly, to the City of Philadelphia and the trustee to enter into an agreement with the Philadelphia Museum of Art for the continued storage and display of the John G. Johnson Art Collection in the Art Museum for a period of 10 years from the date of this adjudication. Said agreement shall be in the form submitted to the court for inspection by Mr. Wells, counsel for the trustee, a copy of which is attached to the record, the executed agreement to be submitted to the court for inspection within 30 days from this date. At the expiration of this 10-year period the trustee will

again present the matter before the court for further consideration.

The next question which presents itself is what is to be done with 510 South Broad Street. During the course of these proceedings, the city's representatives were informed of the auditing judge's decision not to sanction the sale of the premises. They advised the court that the city was anxious to build a health center on the site, even if they could not purchase it, but that the city could not secure the funds from the Federal Government, which would be necessary to enable it to erect the health center, unless it could lease the land for a minimum period of 50 years.

An ordinance, Bill No. 2175, was approved by the Mayor on June 10, 1958, authorizing the city solicitor to join with the trustee in a petition, requesting the court to grant leave to enter into a lease for a term of 50 years for premises 510 South Broad Street for health center purposes, and to repeal inconsistent legislation.

In order to determine what was a fair valuation of 510 South Broad Street, the opinions of five of the best recognized and most respected real estate appraisers in the community were obtained at the time the petition for the sale of the property was being considered by the court. These experts were Louis A. Harrison, Samuel T. Hall, J. Solis-Cohen, Jr., Oscar Stern and Benjamin A. Strouse. Their appraisals varied from a low figure of $60,000 to a high of $120,000. As the property was to be leased and not sold, the value of these appraisals diminished in importance, since the city is in duty bound under the contract to make up any deficits in the cost of maintaining the art collection. The auditing judge therefore concluded that a valuation of $100,000 for the property was fair and reasonable for the purposes of the present proceedings and that an annual rental of four percent of this sum, or

$4,000, was just and proper. A decree was accordingly entered by the auditing judge on June 27, 1958, authorizing the trustee to lease the premises to the City of Philadelphia for a period of 50 years, from July 1, 1958, at an annual rental of $4,000. The City of Philadelphia was given the right to demolish and remove the present structure on the site and to construct thereon a public Health Center.

The auditing judge is not pleased with the conclusions which he has been obliged to reach in this case. They appear, however, to provide the only practical solution under the difficult situation with which the court is confronted. The art collection will remain at the Art Museum for the present, where it will be safe and will continue to be exhibited to the public under the careful supervision of the court. Title to 510 South Broad Street will remain in the trustee and the court will be able to make a final determination of all aspects of the case when the lease to the city terminates.

This plan for leasing the Broad Street property to the City of Philadelphia for a period of 50 years to enable it to build a health center on the site and the continued housing of the art collection at the Art Museum was approved at the hearing held on October 14, 1958, by Mr. McCouch, on behalf of the University of Pennsylvania, and Lois G. Forer, Deputy Attorney General for the Commonwealth of Pennsylvania.

On October 25, 1958, the auditing judge received a letter from Sherman Baldwin, a member of the New York law firm of Lord, Day and Lord, stating that he represented the Metropolitan Museum of Art in New York City. He requested that no decision be made in this case until he had an opportunity to consult a lawyer in Pennsylvania to obtain an opinion as to the rights of his client under the will. The case was accordingly continued and set down for a special hear-

ing on November 10, 1958. Mr. Baldwin engaged Edward Darling of Bedford, Waller, Griffith, Darling and Mitchell, a law firm practicing in Wilkes-Barre. Mr. Darling requested a further extension which was granted and the case was fixed for a hearing on November 19, 1958. At this hearing, Mr. Wells produced a letter from Mr. Darling, dated November 13, 1958, in which he stated:

"On behalf of the Metropolitan Museum of Art in New York City, and at the request of its attorney, Sherman Baldwin, Esquire. I am writing to inform you that no claim will be made on behalf of the Metropolitan Museum in the proceedings now pending before Judge Klein and, therefore, no representatives of the Metropolitan Museum will appear before Judge Klein on November 19th to present any claim on behalf of the Metropolitan Museum."

During the course of the several hearings held in this matter, it appeared that at no time had a physical inventory and examination been made by the trustee of the paintings, sculpture, books and other objets d'art, comprising the Johnson Art Collection. In view of the fact that the collection had been moved on several occasions, the auditing judge was of the opinion that such an inventory and examination should be made to make certain that the collection is intact and that none of the paintings and sculpture have been stolen, destroyed or replaced with substitutes. Accordingly, an examination of the collection was made in May of 1955, by Samuel Freeman, Esq., official orphans' court examiner. Mr. Freeman was assisted by George L. Stout, Director of the Gardner Museum of Boston, and David Rosen, Technical Adviser to the Philadelphia Museum of Art and the Johnson Collection. A comprehensive report was filed by Mr. Freeman, in which he sets forth in detail the results of his investi-

gation. The auditing judge is now satisfied that the collection is intact and that its continued safety is being well safeguarded. The examiner's report is accordingly approved and ordered to be filed with the records in this case. . . .

And now, December 17, 1958, the account is confirmed nisi.